## Appeal of Zachariah M'Farson.

1. The act of the 24th February, 1834, was passed in aid of the defective remedies afforded by the acts of 1st March, 1792, and 10th March, 1818, by conferring on the Orphans' Court chancery powers in compelling the specific fulfilment of contracts for the sale and conveyance of land, made by decedents who die without providing for the execution of their agreements.

2. The Orphans' Court having jurisdiction of the accounts of the decedent's administrator, and not the one within whose jurisdiction the land lies, has cognisance of bills to enforce specific performance of contracts made by the decedent for the sale or conveyance of such land.

3. Any memorandum in writing indicative of the intent of the parties, and so precise as to enable the inquirer to ascertain the terms of the contract, the land to be conveyed, and the price to be paid for it, is a sufficient contract in writing to be enforced specifically. The statute of frauds is satisfied by a note in writing not under seal, signed only by the party called on to fulfil it, if the other has accepted it. Words of inheritance will be supplied in such note, where circumstances evince the intention to pass the fee.

4. It is only where an oral agreement is averred, that it is essential that a vendee should have taken possession of the land in pursuance thereof; an agreement in writing, within the statute of frauds, is good, without a corresponding possession.

5. The words of the act of 24th February, 1834, speaking of the vendor "dying seised and possessed of such real estate," are satisfied by a legal or constructive possession, whether the agreement for the sale be oral or in writing.

Appeal from the decree of the Orphans' Court of Allegheny.

*Sept.* 18. Zachariah M'Farson presented a petition to the court below, of the following purport:—

"The petition of Zachariah M'Farson, of Beaver county, showeth, That Nathan M'Farson, late of Allegheny county, died on or about the — day of January, 1848, at the county last aforesaid, intestate, that letters of administration have been issued in the

course of law to John and Reuben M'Farson, administrators of the goods, chattels, and estate of said Nathan M'Farson.

"That the said Nathan M'Farson, on 23d October, 1833, was seised in fee of a certain tract of land, situate in the county of Beaver first aforesaid, No. 99, in Braden's district, containing 320 acres, and allowance : That being so seised, said Nathan M'Farson did, by a bargain or contract in writing, bind himself, his executors, &c., to convey the south half of said tract of land unto your petitioner, in fee-simple, for the consideration mentioned in said contract or bargain in writing, which written contract or bargain is in the words following, to wit :—

"'Know all men by these presents, that I, Nathan M'Farson, of Ohio township, Allegheny county, and state of Pennsylvania, bind myself, or my executors, or administrators, as the case may be, at my natural death, to make my son, Zachariah M'Farson, a sufficient title for the south half of lot No. 99, in Braden's district, containing 160 acres and allowance for his own use, for sixty dollars, and other remembrances I have received of him.   In witness whereof, I have hereunto set my hand, this 23d day of October, 1833.

[Signed]                    NATHAN M'FARSON.'

"That your petitioner has paid the consideration money therein mentioned, in full, and done all that was required of him in the fulfilment of his part of the said contract, as appears by the copy of the same set forth above, but that no sufficient provision for the performance of the said bargain or contract appears to have been made by the said deceased in his lifetime, though he was well satisfied, and intended that the same should be consummated : your petitioner therefore prays, that this honourable court will designate some day certain, at which notice may be given to the administrators and heirs of said deceased, Nathan M'Farson, to appear in your said court and answer this bill or petition ; and furthermore that this honourable court will be pleased to decree the specific performance of the said contract, according to the true intent and meaning thereof, in order to the completing of his title," &c. &c.

A citation was issued to the proper parties, upon the return of which the questions argued in the court below were, 1. Whether the application should not have been made in the *forum rei sitæ*, and not of the domicile of the decedent.   2. Whether the case presented warranted a decree of specific performance ; and 3. What was the nature and extent of the estate sold.   The court below

refused to decree the specific performance of the contract. Whereupon the petitioner appealed to this court.

Among the evidence brought up on the appeal was the following deposition of John Neely :—

"I was intimately acquainted with decedent, Nathan M'Farson, late of Ohio township; said Nathan called on me to know if I could write an instrument of writing, that would compel his executors or administrators to make a title to Zachariah M'Farson, for the south half of No. 99, in Braden's district; he said that he had sold it to his son, and had received $60, and the work that his son had agreed to give him as payment, and that he had agreed to give him a title for it, but that if he gave him [Zachariah] one, he had other sons who would be importuning him for deeds of other parts of the land, if he gave Zachariah a deed; 'and I have sons,' said he, ''Squire, that if I would make a title to them for it, they would not have it two years, and they might put some person under my nose there that I would not like ;' he asked me when I would be at home ; this was the evening that I made the survey of the land ; after making the survey I went home that night, and drew up this paper [set forth in the petition]; the next day Nathan M'Farson came to my house for it, and I read it to him, and he instructed me to put his name to it, and he put his mark to it, and I signed it as a witness, and he paid me twenty-five cents for the job; he paid me a dollar for the survey the evening before; the name 'John Neely,' as witness present to the execution of said paper, is in my handwriting; the paper A. is annexed, and is of the date of the 23d October, 1833; the paper was acknowledged by him at the time he signed it. I was an acting justice of the peace at that time ; I did not engross the acknowledgment at the time; I did afterwards; Nathan M'Farson took the paper away with him before I had written the acknowledgment; I told him at the time that I had not time then to write the acknowledgment, but would do it again, and he said that would do; this was at the time he signed the paper; I did not see the paper again until Zachariah M'Farson brought it to me after I had moved to the new place, which was about three and a half years afterwards; he then said to me that he did not think it was good enough for a title, and spoke of the paper being liable to be lost, and I advised him to go and get it recorded, and he afterwards came to me and said he could not get it recorded, because it had not been acknowledged before a justice of the peace; that there was no acknowledgment to it; 'Is there not?' said I, for I had forgotten that I had not written the acknow-

ledgment to it, and I then wrote the acknowledgment to it. I was an acting justice of the peace for the county of Beaver, at the time the paper was acknowledged before me, and also at the time I engrossed the acknowledgment.

"When he put his mark to it, I asked him if he acknowledged that to be his act and deed. I always do that, when a man can't write, before I sign my name as a witness. When he first asked me to write the paper, he asked me if I could write one that would stand in law—that they could not break. He stated that upon the line. At the time he said this, we were surveying, and Zachariah was there; and he said to his father (Nathan M'Farson) to speak to Neely now to make the deed, while he is here, and Nathan said, 'I am not going to make you a deed.' 'There is no use surveying,' said Zachariah, 'you promised to give me a deed, and you know I paid you for it—$60 in money, and' (I disremember whether it was) 'two or three years' work. You know,' said Zachariah to him, 'that I boated hard for that money, and I will go no further now, if you are not going to make me a deed. I don't care about going on with surveying, if you are not going to make me a deed.' 'It is none of your business about the surveying,' said Nathan, 'I hired Neely, and I will pay him.' I told him (Zachariah) not to get out of humour, but let us go on, and finish the surveying. We then went on, and completed the survey. Nathan M'Farson asked me if I could make an instrument of writing, that would compel his executors or administrators to make a deed to Zachariah—'for,' said he, 'he has paid me for it, and I want to live up to my bargain—it was my bargain to make him a deed; but if I make him a deed, I have other sons that will be importuning me for deeds, and I have some sons, that if I gave them a deed, they would not have the land two years, or they would put somebody under my nose that I would not like.'

Cross-examined.—"I wrote the instrument the same evening, after having made the survey, the day of its date; I wrote on the same night of the day I made the survey. It was written in Beaver county, upon what I call my upper place. It was not signed on the same evening; it was signed by Nathan M'Farson the next day. I wrote the signature of Nathan M'Farson. I indited the instrument myself; the composition and the framing of it is my own. I had nothing, no previous writing, or copy, to go by; nothing but the bargain that the old man related to me. I did not know at the time I went to make the survey, that there was a bargain between the old man and the son; I knew nothing of the contract, until I

had run about half way of the northern line. This was where the substance of the agreement was related to me. It was never related to me before that. It was not related to me afterwards, before I reduced it to writing. Nathan M'Farson died about the last of December last. He signed it in 1833, and died last year. I can't tell when the acknowledgment was engrossed. It was after I had moved to the new place; I moved to the new place about three years after I wrote the instrument. In my examination in chief, I mean to be understood, not that I engrossed the acknowledgment three and a half years after the instrument was written, but that I had moved to the new place in about that time after I wrote it, and that the engrossment was made after I moved there; I don't know how long after."

*Wills* and *M'Clowry*, for the appellant.—1. As to the jurisdiction: This application must be made to the Orphans' Court having jurisdiction of the accounts of the executor or administrator: §§ 15, 17, act 24th February, 1834; Purdon, 437, 438. Nathan M'Farson was a resident of Allegheny, and administration of his estate was taken in that county.

2. Is this a proper case in which to decree specific performance? This, according to Buckley's evidence, was a joint purchase by the decedent and the petitioner, with joint funds, equally contributed— the title being made to the decedent, who thereby became a trustee for us. We are in possession of our part, and so cannot resort to ejectment. Since the survey, the decedent has been trustee for the specific part of the land occupied by us. If we cannot obtain this decree, we have no remedy.

This remedy is not confined strictly to sales. It has been extended to a constructive mortgage: Wetherill *v.* Seitzinger, 9 W. & S. 177. But as a " parol sale" of land, " so far executed that it would be against equity to rescind the same," not presented as such in the petition, but made out in the proof, the decree should have been made. The petition should have been amended, if necessary. The law authorizes such decree, whether the sale be parol or in writing. In all the essential elements of a precisely ascertained contract, (exclusive possession in pursuance of it, and that delivered in the life of the vendor,) this case falls strictly within Sage *v.* M'Guire, 4 W. & S. 229. It is however equally strong, if regarded as a contract *in writing.* Under which aspect, the only question that can arise is, whether the decedent had such seisin of the land as is required by the act to authorize the decree. He had no actual " seisin and possession," nor were they necessary, as was decided

in Sage v. M'Guire, which was the case of a parol contract. The words of the act are the same, touching this seisin, in regard to contracts by parol and in writing. Legal seisin and possession, by virtue of the legal title retained, are all that are required in a parol contract; a fortiori, they are sufficient in case of a contract in writing, accompanied with change of possession.

3. In an executory agreement, which is a conveyance only in equity, the word heirs is not necessary to carry a fee : Defraunce v. Brooks, 8 W. & S. 68 ; 4 Kent's Com. 7, note.

M'Candless and M'Clure, contrà, referred to the following authorities:—Smith v. Patton, 1 S. & R. 80 ; M'Farland v. Hall, 3 W. 37 ; Stewart v. Stewart, Ib. 253 ; Woods v. Farmer, 10 Ib. 195 ; Allen's Est. 1 W. & S. 383 ; Dock v. Hart, 7 Ib. 172 ; Eckert v. Eckert, 3 P. R. 332 ; Wack v. Sorber, 3 Wh. 387 ; M'Clure v. M'Clure, 1 Barr, 374.

The paper not being signed by both parties, and the evidence, would not warrant a verdict in petitioner's favour. And there is not enough to satisfy a chancellor.

These proceedings purport to be under the act of 1834. They should have been under the acts of 1st March, 1792, and 10th March, 1818, and do not conform with either. The C. P. was the proper jurisdiction : Chess's Appeal, 4 Barr, 52. The act of 1834 does not repeal the acts of 1792 and 1818.

The opinion of this court was delivered by

BELL, J.—Apart from the authority of Chess's Appeal, it is very obvious, that the act of February 1834 was passed in aid of the defective remedies afforded by the acts of March 1792 and 1818, by conferring upon our Orphans' Courts the power exercised by a court of chancery, to compel the specific fulfilment of contracts for the sale and conveyance of land, made by decedents who die without providing for the execution of their agreements. Wherever, therefore, a chancellor would, in these cases, direct a conveyance to be made in discharge of a decedent's undertaking, the proper Orphans' Court is bound to interpose its statutory authority with like effect. The first question then suggested is, do the petition, answer, and proofs present such a condition of facts as would entitle the complainant to invoke the aid of a chancellor ? If this can be answered affirmatively, the decree sought follows of course. Is this, then, the position of the present petitioner, and has he brought his complaint before the proper Orphans' Court ?

It is most convenient to answer the latter portion of this query

first. By the express direction of the act of 1834, the application is to be made to the Orphans' Court having jurisdiction of the accounts of the decedent's executors or administrators. M'Farson, the vendor in this instance, lived and died within the county of Allegheny. Consequently, if any respect is due to the statutory direction, the tribunal vested with jurisdiction of the subject of controversy, is the Orphans' Court of that county, though the lands lie in the neighbouring county of Butler. The proper forum has therefore been selected. Indeed, this is so entirely plain, I should not have deemed it necessary to say a word on this point, had it not been gravely suggested by highly respectable counsel, certainly without due reflection.

What is the answer properly to be made to the other branch of this inquiry? According to the uncontradicted testimony of Carson and Buckley, the tract of land, in a moiety of which the petitioner asserts his ownership, was purchased upwards of twenty years ago by the father and son, each having contributed an equal share of the purchase-money. This was followed by an informal partition of the tract and a distinct possession of the purparts, though the legal title was conveyed to and remained in the father. The son commenced immediately to improve the portion allotted to him, and has continued to do so up to this time. In this aspect of it the transaction presents a case of resulting trust, or of an oral sale, so far executed by possession, payment of purchase-money, and improvement, that a refusal to perfect it would be a fraud on the vendee. In either case, a chancellor would not hesitate to direct a specific execution by conveyance. But this is not the ground upon which the petitioner has chosen to found his right to call for the interposition of the Orphans' Court. He sets up an agreement in writing for the conveyance of the land, either by the decedent himself, or his representatives after his death, and he gave evidence to prove it. The consideration which induced this undertaking is stated in the writing itself, and is besides more distinctly proved by the person who, at the request of the decedent, prepared the instrument. Its execution is not denied, and, though its delivery to the son was faintly questioned on the argument, the circumstances which preceeded and followed the execution of the paper, as detailed by Neely, leave no room to apprehend that the son became possessed of it otherwise than honestly. The reason why an immediate conveyance was not made, as seems to have been originally contemplated, was stated, and is such as may well be supposed would influence the action of a father who feared the importunity

of his other children, and was desirous of affording them no pretext for it. It therefore forces itself on our acceptance, as satisfactorily accounting for the delay.

As a general rule, it is said that to entitle an agreement to be specifically performed, it must be executed according to the forms prescribed by law, by parties able and willing to contract; and should be certain and defined, fair and equal : Walpole v. Orford, 3 Ves. 420 ; Baxton v. Liston, 3 Atk. 385. But no express form of words is necessary to its validity. Any memorandum in writing indicative of the intent of the parties, and so precise as to enable the inquirer to ascertain the terms of the contract, the land to be conveyed, and the price to be paid for it, is sufficient. Thus a correspondence by letters, which reasonably import a conclusion, has been sustained as an agreement: Huddlestone v. Briscoe, 11 Ves. 591 ; Stratford v. Bosworth, 2 Ves. 366. And this though the person did not intend to be bound: Wilford v. Beazly, 1 Ves. 8 ; S. C. 3 ; Atk. 503 ; or looked to the execution of a more formal instrument: Fowler v. Freeman, 9 Ves. 351. A somewhat striking instance of the extent to which chancery will go in upholding agreements loosely and informally expressed, is furnished by Gray's Executors v. James, 4 Dess. 185. There, a man, without provocation, had driven away his wife and daughter. After the lapse of years, he invited the latter by letter to return and live with him, promising to make her heir to his property. With the assent of the mother, the daughter accepted the invitation ; but, not long after, was again compelled to leave her father's house, upon the allegation of disobedience, and he, subsequently, devised his property to strangers. And it was decreed the letter contained a valid contract, which chancery would enforce against the executors and devisees of the father.

The general rule, with the explanations I have stated, is recognised by our own case of Holt v. Selden, 5 W. 528, which, with, the English authorities, also ascertain that their statute of frauds, and our act of 1772, are satisfied by a note in writing not under seal (Wheeler v. Newton, Prec. in Ch. 16), and signed only by the party called on to fulfil it, if the other has accepted it : Bird v. Blosse, 2 Vent. 361 ; Moore v. Hart, 2 Ohio R. 167 ; Wankford v. Fotherby, 2 Vern. 322 ; Long v. Mehaffy, 10 W. 387. Nay, it has even been ruled that an agreement in the handwriting of the party to be affected by it, beginning " I, A. B., agree, &c.," is sufficiently signed within the statute : Knight v. Crockford, 1 Esp. N. P. C. 190, cited in 2 Bos. & Pul. 239, by Ld. Eldon ; 1 Madd. Ch.

372, *et seq.* There is another well ascertained principle, proper to be noticed, as applicable to the inquiry we are now prosecuting. It is, that executory contracts for the sale of lands, like wills, are interpreted to give effect to the intention of the parties. Therefore, in equity, where they operate as conveyances, an express limitation to the heirs of the vendee is not indispensably required to carry a fee ; for words of inheritance will be supplied, where the consideration paid, or other circumstances, evince that no less than a fee was intended. Generally, a covenant to make a lawful deed of conveyance, or a sufficient title, is understood to mean a fee: Dearth *v.* Williamson, 2 S. & R. 490; Defraunce *v.* Brooks, 8 W. & S. 68.

So far then as the question is of the contract asserted by the complainant, every requisite would seem to be present. It is in writing, is sufficiently certain and defined in every required particular, inclusive of the question of estate to be conveyed, was made by parties able to contract upon a valuable consideration, and imports to be fair and equal. Why should it not then be executed ? The purchaser has done all incumbent on him to do, including the early call addressed to the representatives of the seller, to perform their part. He paused on his inchoate title until the death of his father, because compelled to acquiesce by the alternative terms of the agreement; but immediately on that event occurring, he showed himself "ready, desirous, prompt, and eager" for the completion of the bargain: Milward *v.* The Earl of Thanet, 5 Ves. 720, in note.

This is all conceded. But it is said for the defendants, that the testimony of Neely, who prepared the writing and proves its execution, is in a material point so contradictory, as to repel belief from every part of his narrative. We have failed to perceive that this allegation is well founded. On the contrary, it appears to us everywhere to bear the impress of truth, and to be wholly consistent with the undisputed facts that cluster round the transaction. It is, however, strongly corroborated by all the other evidence in the cause. That portion of it thought to be open to the imputation of repugnancy, is in our apprehension of easy reconciliation, without the slightest invasion of the rules by which testimony is weighed and valued. That after the lapse of three and a half years, the witness had forgotten his omission to reduce the vendor's acknowledgment of the instrument to writing, may very well stand as consistent with his declaration, that when it was executed, he declined to write the acknowledgment for want of time, and promised to do

so at some future day.   This, I believe, is the only portion of the
deposition complained of, and it certainly leads to the suspicion
that the ingenious counsel who argued for the defendants, encoun-
tered some difficulty in pointing out a defect in the proofs, and in
selecting his point of attack.   In connexion with this subject, to
prevent misapprehension, it is proper to remark, that a written
acknowledgment of the contract was unessential to its validity;
and it is therefore unnecessary to say, whether the subsequent act
of the magistrate, in formally engrossing it, can be,supported as a
due exertion of authority.

Another objection, that the vendee did not take possession of the
land in pursuance of the contract, is dispelled by the answer, that
such possession is unnecessary.   It is only essential where an oral
agreement is averred.   *That* we are now dealing with, is a writing
within the statute of frauds, and, therefore, good without a corre-
sponding possession.   It is, however, beyond controversy, that
here there was a long-continued possession, commencing with the
original arrangement of the parties, of which the written agree-
ment is merely an emanation.   I believe I have noticed all the
grounds upon which the respondents venture to combat the preten-
sions of the petitioner.   His counsel has, however, noticed to refute
a seeming difficulty springing from part of the act, which speaks of
the death of the vendor, "seised and possessed of such real
estate."   It is conceded that, in the instance before us, the elder
M'Farson was not in the actual seisin or possession of the land
sold, at the time of his death.   But the language of the statute
must be held satisfied by a legal or constructive seisin, for, other-
wise, much the largest number of these contracts, which with us are
usually followed by possession in the vendee, would be cut out from
the benefit of the statutory remedy: a result certainly never contem-
plated by the framers of the law.   Besides, the same language is
used in the succeeding section, relating to oral contracts, where a
part execution, by a transfer of the actual possession, is absolutely
necessary to bring them within the operation of the act.   To
require, in such cases, actual seisin in the vendor, would be to
defeat the contract altogether.   From this review of the facts of
the case, and of the principles applicable in its adjudication, it is
plain the vendee is entitled to the remedy prayed by his petition.
The decree of the Orphans' Court denying it must, therefore, be
reversed; and, as we have full possession of the case on appeal,
the proper judgment directing a specific execution will be pro-
nounced here.

The irregularity of proceeding to proofs and hearing, before answer, was waived below and in this court. We cannot refrain from remarking, that it would be best, in these cases, to adhere to the course of procedure contemplated by the statute. In many instances this might save time and labour.

Specific performance decreed.