## ROB. VanHORN v. J. H. MUNNELL ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS OF LAWRENCE COUNTY.

Argued October 12, 1891—Decided November 9, 1891.

1. In an action to enforce specific performance of a written contract that is lost, the proof of its terms by oral testimony stands upon the same basis as if it were a parol contract. In such case, the precise terms of the whole agreement must be proved by the most clear and indisputable evidence: Sage v. McGuire, 4 W. & S. 228; McFarson's App., 11 Pa. 503.

(a) In ejectment to enforce an alleged written contract between the plaintiff and his deceased father, under which plaintiff, on doing certain things during his father's lifetime, was to get the latter's farm at his death, the scrivener of the agreement, called to show its loss and prove its terms, did not undertake to recall the whole of it, but only what he considered the principal points:

2. Under the settled rules of evidence, this proof, by reason of its failure· to show the whole of the contract, was insufficient. For this reason, and because the testimony, in so far as it did exhibit the terms of the agreement, fell short of the requirement that they must be shown with precision, it was the duty of the court to affirm a point requesting an instruction to find for the defendant.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL JJ.

No. 77 October Term 1891, Sup. Ct.; court below, No. 32 March Term 1890, C. P.

On January 7, 1890, Robert VanHorn brought ejectment against James H. Munnell and James S. Munnell, executors of Abraham VanHorn, deceased, David Fox and Rachel Fox, for a tract of land in Slipperyrock township. The defendant, Rachel Fox, not having appeared, judgment was entered against her by default. The executors above named pleaded not guilty.

At the trial, on November 10, 1890, the plaintiff claimed to recover upon a written contract between himself and Abraham VanHorn deceased, his father, made in 1865, and called Joseph M. Burton, who testified that he was the scrivener of the agreement in question; that it was left in his custody for many years, and finally the old gentleman came and got it from him; that the witness, after Abraham VanHorn's death, made inquiry for it of one of the executors, who said that it had been destroyed in his presence by the old man. The witness testified further as follows:

" Q. Did you ever see the article after it was given to him? A. I never saw it after I wrote it, except the outside of it, just that once that I gave it to him. I put it away and never looked at it again. Never refreshed my memory or pretended to, anything about it. . . . . Q. State now what were the contents of the article of agreement which you drew?"

Objected to by the defence, that the contract of the decedent had not been proved as provided for by § 2, act of March 31, 1792, 3 Sm. L. 66; that the contract of the decedent had not been proved as required by acts of assembly.

By the court: For the present, the objection is overruled. When we come to hear this question argued we will hear you fully upon it. It occurs to the court in this way, that so far as this title is concerned, that contract, if a contract at all, is executed; there is nothing to convey and there would be no object in proceeding under the act of 1792, for it applies to executory contracts for the conveyance of land.[2]

" Q. State, now, Mr. Burton the contents of the article of agreement written by you? A. Well, it is so long ago that I can't say that I can do so, only I will state to the best of my recollection, that is all; the details I cannot recollect. There are some things that I know, and some things that I do not recollect. What I recollect I will give, and what I don't know or don't recollect, I wont give. In the first place Mr. Van-

Horn,—Mr. Robert VanHorn,—was to farm the place, to do all the work; and he was to provide, as far as my recollection serves me, half the seed; all the work and half the seed, and he was to get half the pasture. The old man was to provide the other half of the seed and get the other half of the pasture; and at the old man's death,—provided it continued until that time, of course,—at the old man's death, Robert was to get the place. The old lady was to be kept, and I think she was to have kept for her two cows and a few sheep, six maybe, or something like that. That is all I can recollect. There may have been other things in the agreement, but I can't tell you what they were. Q. You don't say that there were any others ?. A. No sir, I don't say that there were any others. Q. That is the whole of the agreement? A. Yes sir, as far as my impression will serve me."

Cross-examined: " Q. You have not seen that agreement from the time you wrote it? A. I never have seen the inside of it, and never the outside but once that I recollect. . . . . Q. Are you able to state positively that this agreement that Robert should have the farm was in that agreement or not? A. Yes sir, I feel pretty positive on that. I have other things that impress that on my mind. I believe that was there. Unless I would see the agreement and see that it was not there, would be the only thing that would convince me that it was not there. Q. Then you might be mistaken? A. O, well, every man is liable to be mistaken, but I feel very sure that was there. The more I think about it the more impressed I am that it was there. . . . . Q. You have stated that you were not sure whether it was in or out? A. Well, I have stated it just in that way, that of course it is possible for a man twenty years ago not to recollect perfectly, but I feel, as far as I can possibly recollect, I feel very positive that it is as I stated. Q. This is longer than twenty years isn't it? A. It is longer than twenty years; I can't state how much over. Q. Haven't you stated that you would not be positive whether this was in the agreement or outside of it; that you might be mistaken? A. Of course, I would say that much about it, that it is possible for a man to be deceived. It is possible, but I don't think it is; I feel very sure that that was in the agreement. Q. Didn't you say to Mr. James S. Munnell that you might be mistaken;

that you might have got the idea from some other conversation? A. Yes sir, and I say so to you now, that such a thing is possible, but nothing would convince me of it but seeing the paper and seeing it was not there; then I would say I was mistaken. Q. You made the remark, that Robert was to get the farm if he stayed? A. Yes. Well, that was the understanding. That was the understanding all the time, that he was to stay and do all the work on the farm. Q. Was that in the agreement? A. That was in the agreement. Q. Was there anything at all said, in the case he went away or left? A. No sir, there was nothing said about that at all. There was no provision for anything of that kind. The understanding was that he was to farm the place as long as the old man lived and on those terms. These bequests that I heard read here, I don't recollect any of them. There may have been something of the kind. Q. Do you know whether there were any bequests in that agreement? A. I don't recollect that there were. There might possibly have been, because that was the immaterial part of it to me. Q. You have no recollection that there were any bequests in it? A. No sir, I have told you all that I can recollect that I think was there. There may have been some other things there. It is the principal points only that were left on my mind. It is so very many years ago that it is hard for a man to say positively, and the court will please to give me the advantage of that fact."

Henry Thompson and Margaret Thompson testified to a conversation with Abraham VanHorn, in which the latter stated that his farm and everything on it would belong to Robert at his death, without, however, mentioning any agreement between himself and Robert upon the subject.

A. W. VanHorn, a son of the plaintiff, testified:

" Q. Did your grandfather tell you the substance of that article? A. Yes sir, he did. Q. What did he say to you were the terms of that article? A. Well he said there was four hundred and fifty dollars to go. to my grandmother; it was what she had in the place. Q. Go on? A. And Rachel was to get two hundred dollars, and the rest of them, Henry one hundred dollars, and Catharine one hundred dollars. Q. What about the land? A. The land was to go to father. . . . . Q. And that is all you know about that agreement; that he

Charge of Court below.

was to remain there until your grandfather died, and then he was to get the farm, was he? A. Yes sir."

Other testimony tended to show that the plaintiff, in pursuance of the agreement, took possession of the land and cultivated it until 1884; that in the spring of that year he left the farm and went to Kansas, on account of the state of his health; that his son, A. W. VanHorn, then took charge of the farm in his place, and continued to cultivate it until the fall of 1885. The son testified that he then went away in consequence of the expression by his grandfather of a desire that he should do so. The defendants offered to show declarations of A. W. VanHorn, to the effect that he had left because he could better himself by going elsewhere, but the offer being objected to was excluded.

Abraham VanHorn died in August, 1889.

At the close of the testimony, the court, Hazen, P. J., after reviewing and submitting to the jury the testimony in the case, charged further, in answer to points, in part as follows:

The defendants request the court to charge:

1. That the evidence offered in this case is not sufficiently clear, direct and certain, to prove the contents of the instrument or agreement made between Robert VanHorn and Abraham VanHorn, which agreement plaintiff alleges existed and is lost.

Answer: This point is not affirmed.[8]

6. That, under the evidence, the verdict should be for the defendants.

Answer: This point is not affirmed.[11]

—The jury returned a verdict for the plaintiff for the land described in the writ, with six cents damages and costs. A rule for a new trial having been discharged and judgment entered, the defendants took this appeal, assigning inter alia for error:

2. The admission of plaintiff's offer.[2]

8, 11. The refusal of defendants' points.[8] [11]

*Mr. James A. Gardner* (with him *Mr. J. M. Martin*), for the appellants.

*Mr. J. Norman Martin* (with him *Mr. D. B. Kurtz* and *Mr. L. T. Kurtz*), for the appellee.

Opinion of the Court.

OPINION, MR. JUSTICE MITCHELL:

This action, being brought upon a lost writing, the terms of which are to be supplied by oral testimony, must, so far as concerns the requirements of proof, stand upon the same basis as an action upon a parol contract. For specific performance in such cases, it is indispensable to prove, by the most clear and indisputable evidence, the precise terms of the agreement: Sage v. McGuire, 4 W. & S. 228; McFarson's App., 11 Pa. 503, 510. And this necessarily means the whole agreement. Even in the case of a writing, this court reversed a decree for specific performance and dismissed the bill, because, among other reasons, the writing was imperfect and did not contain all the terms the grantor desired: Brady's App., 66 Pa. 277; and, the remedy by ejectment being an equitable action, the proof must conform to the required standard to the satisfaction of the judge, who for this purpose sits as a chancellor.

The contract in the present case rests upon the testimony of a single witness, who wrote it about twenty-three years before he was called to testify, and had not seen its contents since. He says: " I never saw it after I wrote it, except the outside, just that once I gave it to him. I put it away, and never looked at it again. Never refreshed my memory, or pretended to, anything about it." This, of course, bears only upon the credibility of the evidence as regards its probable accuracy, but it emphasizes the uncertainty of the testimony which follows. When asked to state the contents of the agreement, he answered: " Well, it is so long ago that I can't say that I can do so, only I will state to the best of my recollection, that is all; the details I cannot recollect. There are some things that I know, and some things that I do not recollect. What I recollect I will give, and what I don't know or don't recollect I wont give. In the first place, Mr. Van Horn—Mr. Robert VanHorn—was to farm the place, to do all the work; and he was to provide, as far as my recollection serves me, half the seed, all the work and half the seed, and he was to get half the pasture. The old man was to provide the other half of the seed, and get the other half of the pasture; and at the old man's death,—provided it continued until that time, of course,—at the old man's death Robert was to get the place. The old lady was to be kept, and I think she was to

have kept for her two cows and a few sheep, six maybe, or something like that. That is all I can recollect. There may have been other things in the agreement, but I can't tell you what they were. Q. You don't say that there were any others? A. No, sir; I don't say that there were any others. Q. That is the whole of the agreement? A. Yes, sir; as far as my impression will serve me." And then, upon cross-examination, he said, further: " These bequests that I heard read here, I don't recollect any of them. There may have been something of the kind. Q. Do you know whether there were any bequests in that agreement? A. I don't recollect that there were. There might possibly have been, because that was the immaterial part of it to me. Q. You have no recollection that there were any bequests in it? A. No, sir; I have told you all that I can recollect that I think was there. There may have been some other things there. It is the principal points only that were left on my mind."

Upon this testimony, it is perfectly clear that the witness did not undertake to recall the whole of the agreement, only what he considered the principal points. This, by the settled rules of evidence, was insufficient. In Dennis v. Barber, 6 S. & R. 420, an extract from a letter was held inadmissible, though the witness who made the copy, a member of the bar and counsel in the case, offered to prove that there was nothing else in the letter relative to the business in question. And to the same effect is Coxe v. England, 65 Pa. 212, 223.

But, taking the agreement as testified to, it falls short of the requirements as to precision of terms. The witness says, " at the old man's death,—provided that it continued until that time, of course,—at the old man's death Robert was to get the place." On the face of this testimony, it looks as if the proviso as to continuance till the old man's death was an inference of the witness rather than a term of the contract, but, taking it as the latter, how can it be told with any certainty what was the present interest acquired by Robert? At most, it could be only an executory and inchoate equity, depending on fulfilment of the conditions during the father's life. But suppose Robert died first, had he an interest that descended to his heirs, and could they step in and fill out the rest of the consideration, or did it lapse, and leave the old man free to contract

with another?  At the old man's death Robert was to get the place.  How was he to get it?  By will, by conveyance under order of court founded on this contract, or by an action like the present, on proof of performance of the consideration?  Without more precise terms of the contract than the witness gives us, none of these questions can be answered except by conjecture.  Again: " The old lady was to be kept, and I think she was to have kept for her two cows and a few sheep, six maybe, or something like that."  How vague this is, and how important may be the " other things " which the witness says may have been in the agreement but he does not recollect, may be judged by the testimony of A. W. VanHorn, son of the plaintiff and called by him to prove performance, who testified that his grandfather told him the terms of the agreement, his father being present, and that " there was four hundred and fifty dollars to go to my grandmother ; it was what she had in the place ; . . . . . and Rachel was to get two hundred dollars, and the rest of them, Henry one hundred dollars, and Catharine one hundred dollars."

As already said, the contract rests upon the testimony of Burton.  The corroborative testimony of Thompson and A. W. VanHorn, as to the existence of an agreement of some kind, adds nothing to the precision of its terms ; while that of A. W. VanHorn gives a convincing illustration of the radical deficiency of Burton's.  The defendants' sixth point should have been affirmed, and a verdict directed in their favor.  As this ends the case, it is not necessary to notice the other points.

Judgment reversed.