CHARTIERS CREEK COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9052. Promulgated February 24, 1928.

*Paul F. Myers, Esq.*, for the petitioner.
*Maxwell E. McDowell, Esq.*, for the respondent.

OPINION.

LANSDON: The issues involved in this proceeding are: (1) Whether certain coal lands were paid in to petitioner for stock by Marion, or whether petitioner acquired title by purchase for cash direct from the grantors named in the deeds; and (2) the proper value at the basic date, should the right to a paid-in surplus be allowed both for purpose of invested capital and depletion.

Section 326 (a) (2) ˚of the Revenue Act of 1918 provides in part:

SEC. 326. (a) That as used in this title the term "invested capital" for any year means * * *

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: * * *

The respondent contends: (1) That no right to a paid-in surplus exists, since petitioner acquired title to the coal lands direct from the grantors named in the deeds, the statute of frauds making void certain oral contracts and assignments by which petitioner takes title through Marion; and (2) that cost is the proper basis for computing depletion.

The petitioner contends: (1) That the oral contracts and assignments are not affected by the statute of frauds; (2) that title to the coal lands was transferred by Marion to petitioner in exchange for stock; and (3) that the value both for purposes of invested capital and depletion is the fair market value at the date paid in to petitioner for stock.

The validity of three contracts and assignments is involved: (1) The written contract of sale from the Union Trust Co. to Marion for the Hazel mine; (2) the oral contract of sale by the Pittsburgh Coal Co. to Marion of the 400-acre tract; and (3) the oral assignments of

both properties by Marion to petitioner. With regard to the written contract for the purchase of the Hazel mine there can be little doubt that Marion acquired right, title or interest sufficient to have compelled a conveyance to him by specific performance in equity. The oral contract with the Pittsburgh Coal Co. and the oral assignment by Marion to petitioner present a different situation. The only memoranda of these contracts were the minutes of the directors' meeting of the Pittsburgh Coal Co. on January 26, 1916, authorizing the sale, and the minutes of the stockholders' meeting of petitioner on February 16, 1916, accepting the assignment of the coal properties from Marion.

The Pennsylvania Statutes (West Publishing Co., Edition, 1920), provide:

§ 20192. *Parol Leases, Etc., Estate in Lands Not To Be Assigned, Etc., Except In Writing*—From and after April 10, 1772, all leases, estates, interests of freehold or term of years, or any uncertain interest of, in, or out of any messuages, manors, lands, tenements or hereditaments, made or created by livery and seisin only, or by parol, and not put in writing, and signed by the parties so making or creating the same, or their agents, thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, any consideration for making any such parol leases or estates, or any former law or usage to the contrary notwithstanding; except, nevertheless, all leases not exceeding the term of three years from the making thereof; and moreover, that no leases, estates or interests, either of freehold or terms of years, or any uncertain interest, of, in, to or out of any messuages, manors, lands, tenements or hereditaments, shall, at any time after the said April 10, 1772, be assigned, granted or surrendered, unless it be by deed or note, in writing, signed by the party so assigning, granting or surrendering the same, or their agents, thereto lawfully authorized by writing, or by act and operation of law. (1772, March 21; 1 Sm. L. 389, § 1.)

Attested minutes of a meeting of corporate directors authorizing the sale of property have been held a sufficient memorandum to satisfy the statute. A reference in the minutes to a survey is a sufficient description of the land if the survey may be identified by parol evidence. The memorandum need only be signed by the grantor and the taking possession of the land is a sufficient acceptance by the grantee. *People's Trust Co.* v. *Consumer's Ice & Coal Co.*, 283 Pa. 76; 128 A. 723. The minutes of the Pittsburgh Coal Co. of January 26, 1916, state the sale price of the property, the number of acres, and refer to a map showing the location of the tract to be sold, but do not designate the grantee. Marion, however, entered into and continued in possession of the property until a deed was issued at his direction to a corporation organized by him. In

*McFarson's Appeal*, 11 Pa. 503, which is a much cited Pennsylvania case, the court states:

> Any memorandum in writing indicative of the intent of the parties, and so precise as to enable the inquirer to ascertain the terms of the contract, the land conveyed, and the price paid for it is sufficient.

Taking possession of land pursuant to an oral contract of sale, together with payment in full or in part of the purchase price, or the making of valuable improvements by the vendee, is sufficient part performance to take the contract out of the operation of the statute of frauds. *Pugh* v. *Good*, 3 W. & S. (Pa.) 56; *Lee* v. *Lee*, 9 Pa. St. 169; *Richards* v. *Elwell*, 48 Pa. St. 361; *Jamison* v. *Dimock*, 95 Pa. St. 52; *Piatt* v. *Seif*, 207 Pa. 614; 57 Atl. 68; 36 Cyc. 654. Marion took possession of the 400-acre tract prior to January 15, 1916, placed workmen on the premises and started work through the adjoining Hazel mine preparatory to mining operations.

The respondent has cited and seems to rely entirely on the *Safe Deposit & Trust Co.* v. *Diamond Coal & Coke Co.*, 234 Pa. 100; 83 Atl. 54. The facts in that case are different. As stated by the court, "It is not alleged that the coal company took possession of any definitely described tract of 200 acres, or in fact, of any coal land in pursuance of the sale, or made any improvements thereon." The court also found that the memorandum or agreement failed "to definitely describe any of the boundaries." In the instant case, Marion took possession of a definitely described tract of 400 acres, agreed to pay the taxes and did certain work on the premises. Also, the corporate memorandum refers to "a map showing its location in relation to the present workings of the company."

Both the oral contract of sale to Marion and the oral assignment by him to the petitioner were complied with by the parties. On direction of Marion a deed to the 400-acre tract was delivered to petitioner by the Pittsburgh Coal Co. The parties not having taken advantage of any legal defects which may have existed in the contracts, but having chosen to carry out their provisions, the validity of the contracts will be recognized by the Board. *Herschel V. Jones*, 1 B. T. A. 1226; *Steinbach Co.*, 3 B. T. A. 348; *The Hub, Inc.*, 3 B. T. A. 1259.

There is no allegation that Marion was acting as promotor or agent for petitioner when he entered into the contracts for the purchase of the two coal properties and the record is clear that he was not so acting. Petitioner's organization was first contemplated subsequent to the completion of the contracts by which Marion purchased the properties.

We are convinced that Marion had right, title and interest in and to the two coal properties and that such right, title and interest were paid in to petitioner on February 16, 1916, for stock.

The petitioner contends that on February 16, 1916, when paid in for stock, the two properties had a combined value of $1,300,000, which amount exceeds the cost to Marion under the contracts of January 15, 1916, by $710,000. In *Northwestern States Portland Cement Co.*, 7 B. T. A. 835, the Board held that the purchase price paid by petitioner's incorporators for limestone lands, shortly before petitioner was organized, and the land exchanged for stock, establishes the value of such lands for invested capital purposes. However, in the instant case the purchase price paid by Marion for the separate tracts does not establish the value of the two properties when combined. The Board held in *Pittsburgh Grinding Wheel Co.*, 2 B. T. A. 712, that the prices at which properties are knocked down at a sale conducted by a trustee in bankruptcy are not conclusive of the actual cash value of such assets when transferred by the purchasers to a corporation in exchange for corporate stock, and the true actual value of such properties may be proven by competent evidence. See also *Markenheim Co.*, 1 B. T. A. 1240. The Hazel mine was purchased by Marion from the Union Trust Co., which had acquired the property through foreclosure of a mortgage. It was obliged to convert the property into cash as soon as possible and was interested chiefly in securing the return of its investment. The 400-acre tract purchased by Marion from the Pittsburgh Coal Co. was distant from the railroad, could not be worked in connection with its other property, and was heavily mortgaged to the Union Trust Co. Neither the sale by the Union Trust Co. nor the sale by the Pittsburgh Coal Co. was under such market conditions as to clearly establish the value of the property.

The Hazel mine was a partly worked tract, the coal content of which was insufficient to make its operation profitable. The 400-acre tract was undeveloped, isolated from the railroad, and from mining operations of the Pittsburgh Coal Company, and of such small acreage that the development expense necessary to procure the coal prohibited its operation as a separate enterprise. Thus considered alone, neither the Hazel mine nor the 400-acre tract was a readily marketable property. When the two properties were combined, however, they became very valuable. The Hazel mine property had a mine shaft and equipment in good condition, and was connected with a railway spur. The 400-acre tract provided sufficient additional coal to make the combined operation highly profitable, since there was little development expense necessary to procure coal from the 400-acre tract.

The record of this appeal convinces us that the petitioner's claim of $1,300,000 is a conservative valuation of the two properties combined. The evidence to support petitioner's valuation claim consists of the testimony of three disinterested witnesses who seem to have been

particularly well qualified to testify with respect to the value of the property in question; proof of the sale of coal land in close proximity to petitioner's property and in the same vein of coal at a price of $1,250 per acre; and proof of the rejection by petitioner in the fall of 1916 of an offer of $1,300,000 for the combined properties.

Samuel A. Taylor, a mining engineer and coal operator who was thoroughly familiar with the property, testified that he appraised the property for Marion in 1916, and that a very conservative value of the two properties combined was on February 16, 1916, $1,115 per acre for the 1,020 acres of coal land. He testified that "if you had paid $1,500 an acre you would not have been paying an outside price."

J. A. Donaldson, vice president of the Pittsburgh Coal Co. in charge of operations, testified on behalf of the petitioner that on February 16, 1916, the two coal properties combined were worth $1,500 per acre for the 1,020 acres of coal land.

W. W. Keefer, who has been engaged as a coal operator since 1890 and is a member of American Institute of Mining Engineers, assisted in appraising the Hazel mine for the Federal court in 1914, and had for many years prior thereto been familiar with both the Hazel mine and the 400-acre tract adjoining. On February 16, 1916, the two properties combined, in his opinion, had a value of $1,200 an acre.

On April 5, 1921, S. L. Clemons, valuation engineer of the Internal Revenue Bureau, submitted to the petitioner a "comment on valuation," which was approved by G. M. S. Tait, Chief, Coal Valuation Section, finding the value of the property on February 16, 1916, to be as follows:

| | |
|---|---:|
| 200 acres surface land, at $25 | $5,000.00 |
| Plant | 70,000.00 |
| Equipment | 60,595.96 |
| Coal | 1,164,404.04 |
| | 1,300,000.00 |

After careful consideration of all the evidence we find the combined coal properties to have had an actual cash value of $1,300,000 on February 16, 1916, as claimed by the petitioner. This property, together with $67,500 in cash and $5,000 for services, was paid in by Marion for all the capital stock. Petitioner assumed payment of the balance of the purchase price which, including the $47,500 payment made on delivery of the deed, totaled $587,500. Deducting such amount from the total assets paid in, there remains a net value of $785,000 which was exchanged for stock of a par value of $75,000. It follows that petitioner is entitled to include in its invested capital as paid-in surplus an amount of $710,000. Depletion should be com-

puted on a valuation of $1,164,404.04, which we have found to be the value of the coal in place. The rate for computing depletion deductions is not in controversy.

Reviewed by the Board.

*Judgment will be entered on 10 days' notice, under Rule 50.*

SMITH did not participate.