66 . 277
145  502

66    277
f224  419

## Brady's Appeal.

1. In a proceeding in the Orphans' Court to compel specific performance, the same principles govern as in a court of equity.

2. Specific performance is of grace; if a chancellor find reasons to withhold his aid, he will leave the party to his remedy at law.

3. Specific performance refused of an executory contract between a son and a very old and feeble father, although in possession of his mental faculties, there being no part execution and there being evidence of trick and undue influence.

4. Peirsoll *v.* Neill, 13 P. F. Smith 420, recognised.

October 25th 1870.　　Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Orphans' Court of *Westmoreland county*: In the estate of Joseph Brady, deceased: No. 41, to October and November Term 1869.

On the 21st of February 1867, Hugh Brady presented a petition to the Orphans' Court, representing, "That on the 13th of February 1864, Joseph Brady, of the same township, entered into an article of agreement, in writing, to sell to your petitioner a certain tract of land situate in Hempfield township, on which the said Joseph Brady then resided, adjoining lands of James Brady, of which this was formerly a part," &c., containing about 100 acres; that Joseph Brady died in July 1866, having made a will, but without having made any provision for the execution of the contract, and leaving a widow who died in August 1866, six children, and the children of two other deceased children, and that George Mechling was administrator, c. t. a. The prayer of the petition was for a decree for specific execution of the contract.

The answer alleged fraud and undue influence: that the article of agreement was fraudulently obtained, and that Joseph Brady, a feeble-minded old man, was deceived and misled by undue influence, and had no knowlege of the nature and character of the instrument he signed, &c.

The agreement was as follows:—

"Westmoreland County, Pa., Feb. 13th 1864.

"An article of agreement maid and executed the above date between Joseph Brady of the first part and his son Hugh Brady of the second part. Said Joseph Brady doth bargan and agree to Deed in fee simple the farm that he nowe lives upon situated in Hempfield Township adjoining my son James—*which I have Deeded to him of same tract,* and P. Sneeder and Barnhart and J. & S. Rugh, containing over one hundred acres at the valuation of Four Thousand Dollars $4000.00 one half of said purchase-money I give him, said Hugh Brady, in right of sonship as his portion of my estate, and the balins of Two Thousand Dollars $2000, said Hugh Brady agrees to pay out of said land as fol-

[Brady's Appeal.]

lows—to his sister Susan Brady as follows One Thousand Dollars to remain a lean upon the Land and said Hugh to pay her, Susan, the Interest anualy of Sixty Dollars a year, on the above one thousand Dollars during her remaining unmarryed, and if she marrys then the Principle is to be paid to her in one year after her marriage, and if she never marrys said one thousand Dollars air to be paid at Susans Death as disposed off by her fathers Joseph Bradys Will—the ballence of One Thousand Dollars to be paid out as disposed off by said Joseph Brady as he sees proper by his Will—said Hugh Brady is to continue to farm said land for the two thirds $\frac{2}{3}$ and to give $\frac{1}{3}$ one third to his Father or Mother as long as either of them lives as he now does he said Hugh paying all Taxes repairs and expenses of said farm and none of said payments to come dew unto one year after the Death of his father and mother if the father dies first said one third of proceeds of farm is to be paid to his mother, and the foregoing payments to commens one year after the death of both his father and mother. On further consultation Hugh Brady agrees to pay five Hundred Dollars in addition to the Two Thousand Dollars afforesaid making it to be paid out in all by Hugh Brady on said land Twenty five Hundred Dol which the partyes agree that theire is about one Hundred and Twenty acres more or less.

Signed sealed this 13th day of February A D 1864 interlinings maid before signing.                    JOSEPH BRADY.  [L. S.]
          Attest,                              HUGH BRADY.  [L. S.]
          JOHN McCULLOGH,
          H. Y. BRADY."

The execution of the article was proved June 3d 1864, by the oaths of the subscribing witnesses and recorded the same day.

The will was dated March 4th 1864. It directed the land mentioned in the agreement, which was all of which the testator died seised, to be sold after his wife's death, and after deducting $200 which he gave to a daughter, he directed the balance to be divided into seven shares, and distributed amongst his children, including Hugh, and the children of his deceased children; James, his son, being omitted, because, as stated in the will, he had been advanced to an amount equal to his share.

Joseph Brady was in his 91st year when the article was executed. His son Abraham had lived on the farm and managed it for his father for some years, when he died. Hugh then came to the farm, and occupied it on the same conditions as those under which he was to hold it by the agreement during his father's and mother's life. At the date of the article Joseph Brady was in full possession of his mental faculties, but in very feeble bodily health; generally bed-ridden.

James A. Hunter, Esq., who drew the will, testified:—

[Brady's Appeal.]

" I asked the old man if we should make any reference in the will to this article between him and Hugh.   He said ' No, write it as though that article had never been made.'   He referred to this article of agreement, and stated that McCullough and Hugh Y. Brady came out and got him to sign it.   He said it wasn't the way he wanted matters at all."

The evidence fixed the value of the property at about $60 or $65 per acre.

The testimony was taken before an examiner.   Its substance will be found succinctly stated in Judge Agnew's opinion.

The court decreed specific performance, according to the prayer of the petition.

The respondents appealed to the Supreme Court, assigning the decree for error.

*J. A. Hunter* and *H. P. Laird*, for appellants.—In cases of inadvertency and surprise, not amounting to fraud, the plaintiff will be left to his remedy at law : Henderson *v.* Hays, 2 Watts 149 ; Mortlock *v.* Butler, 10 Vesey 308 ; Campbell *v.* Spencer, 2 Binn. 129 ; Delameter's Estate, 1 Wharton 374 ; Graham *v.* Pancoast, 6 Casey 89 ; Baker's Case, 2 Johns. Ch. R. 232.   Equity will not decree specific performance of voluntary agreements : Pulvertoft *v.* Pulvertoft, 18 Vesey 91 ; Coleman *v.* Sorrell, 1 Id. 52 ; Atrobus *v.* Smith, 12 Id. 39 ; 2 Story's Eq. § 793 b.

*A. A. Stewart* and *H. D. Foster*, for appellee.

The opinion of the court was delivered, November 3d 1870, by

Agnew, J.—This is a proceeding under the 15th section of the Act of 24th February 1834, in the Orphans' Court, to obtain a decree for specific performance of a written contract for the sale of land between Joseph Brady and his son Hugh Brady.   Hugh Brady, the purchaser, presented the petition against the administrator with the will annexed, and the devisees of Joseph Brady, who died after the written agreement was executed, without making a provision for its performance, and, indeed, having protested against carrying it into execution.   Nothing whatever was done by the parties toward its execution in the lifetime of Joseph Brady.   Hugh Brady, the son, was living on the land, farming it for his father, when the writing was entered into, and continued upon the same terms afterwards.   The terms of the writing upon which Hugh was to remain on the farm during the lifetime of his father and mother being the same, or nearly so, as those upon which he was farming the place, it might be fairly presumed that he was living there after the execution of the writing under its terms, had not the evidence shown the contrary very conclusively. The writing was executed on Saturday, and the evidence shows

very clearly that, alleging it was obtained from him against his will, and was ruinous to his interests, as well as imperfect, omitting provisions essential to his welfare, he demanded its return on the following Monday. He persisted in demanding its destruction, and, after the refusal of Hugh to destroy it, called witnesses to bear testimony to his unwillingness to perform it.

The question, therefore, is whether upon the proof a chancellor would be moved to decree specific performance. The fact that the proceeding is in the Orphans' Court, we think, makes no difference. The section of the act referred to provides that "such court shall have power, if the facts of the case be sufficient in equity, and no sufficient cause be shown to the contrary, to decree the specific performance of such contract, according to the true intent and meaning thereof." The case being referred by the law to equity, the principles which govern the doctrine of specific performance must be the same, whether the case be in the Orphans' Court or in the Common Pleas as a court of chancery. In equity proceedings it is well settled the decree is of grace, and not of right, and a chancellor, if he find reasons to withhold his assistance, will refuse specific performance, and leave the party to his remedy for damages. We have applied this rule in a case decided at the present term: Piersoll *v.* Neill, 13 P. F. Smith 420, opinion by the Chief Justice, where the action was an ejectment to enforce specific performance. In that case it is held that it is the duty of the judge trying the cause, if the case be insufficient in equity, to take it from the jury, by instructing them that on all the facts proved the plaintiff is not entitled to a verdict. The judge takes the place of a chancellor in such a trial, and must see that a verdict be not rendered against the principles of equity. For, though the action is in form at common law, the plaintiff seeking to recover on an equitable title is permitted to do so only on the principle that equity considers that as done which, according to equity, ought to be done. If, therefore, a chancellor would feel that he ought not to be moved by the facts presented, a decree would not be granted.

Applying these principles to the case before us, what are the facts? Taking the testimony of the complainant, it will be seen that this contract of sale did not originate with Joseph Brady and he had no hand in producing it. It came from Hugh Brady, who contrived the plan to procure it, sent the agent to execute his purpose, and suggested the motive to operate upon the mind of his father. Joseph Brady was a feeble old man, upward of ninety years of age, wholly incapable of taking upon himself the direction and management of his farm, confined much of the time to his bed, and having a wife of nearly equal age to provide for. For years his farm had been farmed by his sons. Abraham had died and Hugh taken his place, at a fair and ordinary compensa-

tion in the share of the products he was receiving; and with the prospect of being bountifully provided for in the old man's will. But determining to secure a better provision for himself, which would not depend on his father's will, he gave out that he would leave if the place was not secured to him, and had this communicated to his father. He then secured the services of his uncle, Hugh Y. Brady, to carry out his design. Hugh Y. Brady took with him John McCullough to assist him and to draw the writings, men in whom Joseph Brady had confidence. On Saturday they appeared at the old man's house, uninvited by him and their purpose unknown to him. They talked with him several hours before anything was done. The conversation was turned upon Hugh, that he was going to leave, and the old man said he did not know how he could get along without him. A will was first proposed to him. McCullough said that would not do, and then an article was proposed. It was then proposed to draw one up just to show what the bargain was. McCullough said he would write it down and the old man could see how it would be. McCullough wrote it and read it in a blundering way. Then it was suggested to the old man that he had better sign it until McCullough could get a better one written by Mr. Armstrong of Greensburg. He was urged to sign it lest he might die before the other could be written. Finally their purpose was accomplished. The old man consented to sign it, McCullough led him to the table, held the paper and steadied his hand, and then took possession of the writing, saying he would get Armstrong to copy it and make a better one. During all this time Hugh Y. Brady did the principal part of the talking, aided by suggestions from McCullough. Not a suggestion, by way of initiation, or a word of instruction to make or enter into a contract, came from old Joseph Brady. Everything was done for him. The contract was wholly the production of his visitors, and there is no evidence that he had ever precogitated or intended it. It is true that he signed the paper and was not legally incapacitated to execute it, yet it is manifest his own mind was not in it. There is another sense in which it may be said it was not his contract. The writing was imperfect and confessedly did not contain all the terms that Joseph Brady desired. It contained only the outlines, says Hugh Y. Brady; it was supposed not to be drawn right, and Armstrong was to draw it right. It was awkwardly worded, says McCullough, and he was to get John Armstrong to write another in due form; and when he called on Armstrong to do so, he told him it was not only badly worded, but to put more in it—that Hugh was to haul the old man's coal and lay it down at the door, and take his grain to mill and bring it back. Besides these things, McCullough admits that the old man was to have the house to live in during the lives of himself and his wife, the garden and orchard, and to have hay and pas-

[Brady's Appeal.]

ture, necessarily including the right to keep some cattle on the place; and none of these things are expressly provided for in the writing, leaving all to inference and in a very questionable shape. That this writing was not the result of old Joseph Brady's purpose, was imperfect, and had not his full assent, is evident also from what followed immediately. After the scene was over, and the actors had retired, the old man was silent and moody, then anxious and disturbed; inquired what was in the paper, and complained that the thing was wrong. On Monday morning, without intermediate or outside influence, he sent for his son James, told him McCullough and Brady of Greensburg came out on Saturday and wrote an article—said they had written it against his will, and induced or forced him to sign it—that he did not know they were coming, and had not sent for them, nor had he told them what to write. He then asked James to go and bring back the article, and gave him an order to get it. James went, but McCullough declined to give up the paper. Finally, McCullough, after delaying a couple of weeks, and after several demands for its surrender, took the paper and went with it to Joseph Brady's. His first salutation from the old man was, " O, McCullough, you have got us into trouble here—that paper I signed sold me out of house and home, and Hugh can turn us out any day." He then wanted it to be burned. Hugh, the son, was sent for. His father said, " Hugh, I want this paper burnt, and we'll have less trouble." McCullough asked him if he had any objections. Hugh made no reply. The question was repeated several times without a reply. McCullough made a motion to throw it into the fire, and Hugh said, " Stop—stop—I object to your burning it," and said he was going to abide by that article of agreement. Nothing could more clearly lay bare the true attitude of these parties to each other, and the means which had been used to lead the old man into the snare which the planning of Hugh had laid for him; and I pass by, therefore, the efforts of McCullough to explain the article to the old man, and to induce him to believe that it contained all that was necessary to protect his interests. That he did not succeed is evident from the after conduct of Joseph Brady, and the pains he took to call the attention of Samuel Rupp to the imposition he thought McCullough and Brady had practised upon him, and his wish that Rupp should remember the conversation, to testify to it in court. If we compare the provisions of the article also with the number of the descendants of Joseph Brady, and his known feelings in favor of his other children, there can be but little doubt that he never intended that Hugh Brady should take so large a portion of his estate to the exclusion of the living brothers and sisters, and the children of Abraham and Rachel, who were dead.

Upon summing up the whole case we have, therefore, a con-

[Brady's Appeal.]

tract of sale of the bulk of Joseph Brady's property, not the real product of his own mind and will, but contrived by the planning of his son Hugh for his own interests, procured by persons of his own selection, and by means of operating upon the fears of Joseph Brady, who, from bodily infirmity and age, was incapable of attending to his own affairs—a contract imperfect and defective in its provisions for the interests of Joseph Brady; intended as a precaution against immediate death, and to be supplied by a better one; unjust to the other children, repented of immediately, and its return or destruction demanded, ever afterward repelled and denied by Joseph Brady, and never carried into part performance during his lifetime. Clearly, in such a case, where its character remains unchanged by part execution, a chancellor would not be moved to compel its specific performance, and the court below ought to have refused a decree.

> Decree of the Orphans' Court reversed, and the petition dismissed with costs below, and the costs of this appeal to be paid by Hugh Brady, the appellee.