McElhinney, Appellant, *v.* Belsky.

Argued September 29, 1949. Before RHODES, P. J., HIRT, DITHRICH, ROSS, ARNOLD and FINE, JJ. (Reno, J., absent).

*Harry C. Liebman,* for appellant.

*Benjamin F. Kivnik,* for appellee.

OPINION BY DITHRICH, J., November 15, 1949.

Defendant appellee was the proprietor of a picture frame manufacturing business on premises which he leased at 1124 Washington Avenue, Philadelphia.. He decided to sell his business. He entered into a written agreement with appellant, a business broker, the agreement providing in part that McElhinney was to be entitled to a commission if, during the period of the contract, the business should be "sold or exchanged" no matter who effected the sale.

Belsky testified that he lost his lease as of February 1, 1947, and had so informed McElhinney. When the day to vacate came he moved his stock and fixtures to 625 North 2nd Street, where Israel Pinkus was conducting a similar manufacturing business. The two pooled their respective stocks and formed a partnership which traded under the name Artistic Products Company, the name which Belsky had used at 1124 Washington Avenue. Neither partner put any cash into the business, but Belsky was credited on the books with a capital contribution of $9,348.21.

When McElhinney learned of the partnership transaction he sued Belsky for a commission on the theory that the formation of the partnership was a sale or exchange within the meaning of the contract. Belsky filed preliminary objections in the nature of a demurrer. These were overruled and the case was tried by the court without a jury. The learned court below found for the defendant, basing its decision on the ground

that entering a partnership in this manner did not constitute a sale or exchange under the terms of the written agreement. From the overruling of motions for judgment n. o. v. and a new trial plaintiff has appealed. The judgment will be affirmed.

Belsky signed one of McElhinney's form contracts which included, among others, the following provisions:

". . . I hereby employ you as a sole and exclusive agent for the sale of the property and business described on the reverse side hereof, for the price and upon the terms there mentioned, or for or upon any reduced price or other terms to which I shall consent. . . .

"I agree that if the said property, business, fixtures, equipment and merchandise, shall be sold or exchanged by me, during the term of the said agency whether effected by you or myself or by any other person, I shall and will pay to you the commission of 5/–per cent, upon the total selling price . . . and that I will pay you the same commission if, after the termination of the said agency I shall sell it or exchange it with any person with whom you shall have negotiated during the term of the agency."

Solely for the protection of McElhinney it was agreed that a commission would be paid in the event that (1) Belsky, through his own efforts, or those of anyone else, should sell or exchange the business during the life of the contract; and (2) Belsky, after the termination of the contract, should sell or exchange it with any person with whom McElhinney had negotiated.

In form this is a typical exclusive agency contract. The provision giving McElhinney a commission, should Belsky negotiate his own sale or exchange, must be considered in relation to the entire contract. ". . . (c) A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together": Restatement, Contracts, §235.

Since the printed form of contract was provided by McElhinney, it should be construed most strongly against him. ". . . (d) Where words or other manifestations of intention bear more than one reasonable meaning an interpretation is preferred which operates more strongly against the party from whom they proceed, unless their use by him is prescribed by law": Restatement, Contracts, §236.

Application of the above rules leads to the inevitable conclusion that the provision in question was intended simply to assure McElhinney an exclusive right of sale. It gives him a commission in case Belsky or some other person should accomplish what he himself had been hired to do. In *Turner v. Baker*, 225 Pa. 359, 362, 74 A. 172, the Court, in an opinion by Mr. Justice ELKIN, discusses the exclusive right of sale cases, as follows:

"These cases announce no new rule of law. They are simply declaratory of a fundamental maxim which is that parties are bound by the terms of their own contract. If an owner of real estate chooses to make a contract with a broker in which it is stipulated that the broker shall have the exclusive right to sell the property within a specified time and that he shall be entitled to receive a certain commission if a sale be made within the time designated, no matter who makes it, he is bound by its terms and cannot be relieved from a bad bargain because his agreement may have been foolish or improvident. *Our cases have gone thus far and no farther.*" (Italics supplied.)

Appellant's theory is that when Belsky joined Pinkus in a partnership he effected such a sale or exchange as to become liable for a commission. Blackstone's definition of "sale or exchange" is still followed, as evidenced by the opinion in *Helvering v. Nebraska Bridge Supply & Lumber Co.*, 115 F. 2d 288, 290 (CCA 8c): "When used together, the words 'sale or exchange' comprehend a 'transmutation of property from one man to an-

other in consideration of some price or recompense in value.' 2 Blackstone Comm. 446."

The two basic elements of this definition are (1) a transfer of property from one person to another; and (2) a valuable recompense. To be classified as a sale or exchange the transaction must meet both of these tests. That raises the question: Was the transfer of the business from Belsky to the partnerhip of Belsky and Pinkus a tranfer from one person to another? In other words, is the partnership a true separate entity? This question was discussed in *Morrison's Estate*, 343 Pa. 157, 162, 22 A. 2d 729, as follows:

"We deem it to be the law in Pennsylvania and the approved opinion in most other jurisdictions that a partnership is not recognized as an entity like a corporation, that it is not a legal entity having as such a domicile or residence separate and distinct from that of the individuals who compose it. It is rather a relation or status between two or more persons who unite their labor or property to carry on a business for profit. This is subject to an apparent exception, for while a partnership as such is not a person, it, as a matter of fact, is treated by a *legal fiction* as a quasi person or entity for such purposes as keeping of partnership accounts and marshaling assets. . . . Until the promulgation of Pa. R. C. P. 2128, a partnership could not be sued in its firm name, and even yet, under Pa. R. C. P. 2127, partners must be named individually in actions by a partnership." (Italics supplied.)

To consider this transfer as being from one person to another would require a further extension of the *legal fiction* referred to by Mr. Justice PARKER. If, under these circumstances, the partnership is not treated as a separate entity it follows that Belsky did not make a true transfer of his business but rather worked a change merely in its nature and incidents.

Even if it be assumed, *arguendo*, that the transfer of the business was from one person to another, it was not made for a valuable recompense. Before forming the partnership Belsky had a going business. He owned the stock, fixtures, etc. He collected the profits from its operation, and he had a right to manage it as he saw fit. After he combined his business with that of Pinkus, his rights were determined by statute as follows: "The property rights of a partner are (1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in the management": Uniform Partnership Act of March 26, 1915, P. L. 18, part V, §24, 59 PS §71.

He thus had credit for a capital contribution of $9,348.21 which represented the value—as agreed between himself and his partner—of his going business. He had a right to share the future profits of the partnership and to participate in its management. The $9,348.21 on which McElhinney asserts his claim to a five per cent commission is nothing but a bookkeeping entry which signifies that Belsky has changed his manner of holding title to the specific property from ownership in fee to ownership as a tenant in partnership. It is not a valuable recompense either in theory or as a practical matter. It is rather a recognition of his contribution to the partnership capital. In return for this contribution he has received the right to share in future profits and participate in management. What this right might in time be worth is purely conjectural. It might become totally worthless. On the other hand the partnership might prosper to such an extent as to make Belsky's right to one-half of the profits extremely valuable. McElhinney does not claim that he is entitled to a five per cent commission on Belsky's right to share the profits. Yet it is obvious in law and in logic that *the right to share future profits is the only valuable recompense* which Belsky has received in return for his contribution

to the partnership capital of his going business. This conclusion is strengthened by the use of the words "contribution to capital" in the Uniform Partnership Act, supra,[1] which negatives any notion that such a credit item carried on the partnership's books is in the nature of a recompense or payment.

The question is thus resolved into a reasonably simple proposition. Belsky wanted to sell his business. He hired a broker as exclusive agent to sell it for him. He promised to pay a commission to the broker even if he sold the business through his own personal efforts. Instead of making a sale and getting out of the business, he found that he had to involve himself even more by forming a partnership. If McElhinney wanted a commission on the formation of a partnership he should have spelled that out in the contract.

Judgment affirmed.

---

[1] "Contribution" or "contribute" appears in this sense in relation to partnership capital in §18 (a), §18 (c), §18 (d), and §39 (a) of the Act.