## Sun Oil Company *v.* Traylor, Appellant.

Argued March 21, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN and EAGEN, JJ.

*Dale Cleland,* for appellants.

*Robert A. Doyle,* with him *Clair V. Duff,* and *Duff & Doyle,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 24, 1962:

Charles E. Traylor and Myrtle Traylor, his wife, own a property on Banksville Road in the Twentieth Ward of the City of Pittsburgh. The Sun Oil Company, a corporation engaged in the marketing of gasoline and certain automobile services and accessories, entered into a written agreement with the Traylors on April 6, 1959, to purchase their property for the purpose of erecting thereon a gasoline station, provided it could obtain from the various agencies of the government involved (city, county and state) the licenses, permits and change of zoning classification necessary in order to utilize the property for its business because part of the Traylor land was zoned "Residential" and part "Special Classification," neither of which designa-

tions permitted gasoline stations.* It is important to note this specific provision in the contract, namely, "the performance of this agreement is expressly conditioned upon Buyer being able to secure all necessary permits and licenses to erect, install, maintain and operate said gasoline service and filling station, together with approaches and curb cuts, in accordance with Buyer's plans and specifications."

The agreement also stated that if the Sun Oil Company could not obtain the indispensable authorizations prior to August 31, 1959, it would have the right upon written notice to the Traylors to extend the date of settlement for 120 days.

Upon the signing of the agreement of sale, Sun Oil, through its agents and representatives, began the round of governmental offices to obtain the necessary authorizations and permits absolutely needed before it could erect its gasoline station. It became evident, during the process of this arduous task, that the authorizations could not be acquired prior to August 31, 1959. Accordingly, upon request by the company, the Traylors agreed in writing that the settlement date would be extended from August 31, 1959, to November 30, 1959. Sun Oil then again set out on its journeying into the numerous offices and agencies to secure the permissions still outstanding. By the middle of November it became obvious that considering what yet had to be done the task could not be completed in time for settlement on November 30, 1959, and the Traylors

---

* Before the plaintiff could actually build its gasoline station it had to do the following: Submit a site plan for approval of the city planning commission; obtain building permits from the city planning commission, county planning commission and the State Department of Forests and Water; the zoning classification of the property had to be changed to Commercial and then a special exception had to be obtained from the Board of Adjustments of the City of Pittsburgh.

again agreed, also in writing, that the settlement date would be postponed to April 30, 1960.

On January 26, 1960, the Planning Commission of Pittsburgh accepted the site plan submitted by Sun Oil subject, however, to the land involved being rezoned from "Residential" and "Special Classification" to "M-1" (Commercial.) During this entire period the Traylors evinced in no way any reluctance to cooperate with Sun Oil in its efforts to accomplish its commitments under the agreement of sale. In fact, on April 11, 1960, the Traylors appeared with representatives of Sun Oil before the City Council of Pittsburgh urging the zoning change which would establish the land as suitable legally for a gasoline station. On April 25, 1960, the appropriate ordinance was enacted to effect the requested change in zoning classification. But this did not terminate the labors of Sun Oil to legalize the Traylor land for the purpose specified in the contract. It was now necessary to obtain a special exception before a building permit could be obtained. It accordingly appeared before the Board of Adjustment of Pittsburgh on May 13, 1960 for that special exception. May 18, 1960, saw this mission accomplished and on May 20, 1960, Sun Oil had the last required permit in its hands. On May 24, 1960, Sun Oil advised the Traylors that they could meet two days later to close the transaction.

The Traylors now balked. They demanded a purchase price larger than the amount specified in the original contract of April 6, 1959. Sun Oil refused to pay more than the agreed-upon $30,000 and went into the Court of Common Pleas of Allegheny County to file an action in equity to compel specific performance of the contract.

The Traylors interposed numerous defenses. The case came on for a hearing before a chancellor who decreed specific performance. After the filing of excep-

tions, which were disposed of by a court in banc adversely to the Traylors, they appealed to this Court.

The appellants contend that the agreement of April 6, 1959, is unenforcible on the basis that it lacks mutuality of obligation. In this respect they argue that since the plaintiff company did not attach any plans or specifications to the agreement of sale, it was free to submit whatever plans and specifications it desired to the city authorities and thus, in order to effectuate a repudiation of the contract, it could submit plans which would be unacceptable to the city. In this way, argue the appellants, Sun Oil retained for itself a monkey wrench which it could cast into the machinery of negotiation and thus, when it wished, destroy the contract of sale.

This contention is more of an academic thesis than it is a legal factor in the case since it is undisputed that the plaintiff did fulfill the terms of the contractual conditions and, having done so, the defendants may not now evade their obligations by asserting that had Sun Oil acted differently the defendants would have had no way of enforcing the contract. Even though we do not pass upon such a hypothesis since it is moot in this case, it would be difficult to assume that if a purchaser manifested bad faith in fulfilling an executory contract the vendors would be without remedy in the courts.

The argument presented by the defendants on this subject cannot break through the stone wall of the legal truism: A conditional promise becomes absolute when the condition is performed. (12 Am. Jur., Contracts, §328, p. 883). From the moment Sun Oil faithfully performed the conditions announced in the contract there could be no question that a mutually binding agreement was in force.

Then the defendants complain of the long time employed by Sun Oil in obtaining the authorizations

already discussed and that these protracted endeavors encumbered their property for a longer period than they had agreed to have it encumbered. The defendants were under no obligation to agree to any extension of the life of the contract beyond the option in the agreement, that is, 120 days after August 31, 1959. When that 120 day-period expired and Sun Oil had not yet acquired the authorizations which were the very foundation on which it was to build their gasoline station the defendants could have terminated the contract then and there. Instead, they agreed to extend the time for the settlement until April 30, 1960, and by doing so, supplied, in effect, the plaintiff with authoritative bricks for the foundation of the station. They bound themselves to a mutual modification of the original terms of the agreement.

Once the plaintiff had cleared away all legal road blocks, which had been envisaged by the parties at the time of the original agreement, it notified the defendants on May 24, 1960, that it was ready to pay the purchase price of $30,000. The defendants argue that since May 24, 1960, of course, extended beyond April 30, 1960, the defendants were not required to sell the property. But this argument overlooks the original agreement, which specifically stated that the plaintiff had 120 days beyond the settlement date stated in the contract, in order to obtain the necessary permits. The two extensions voluntarily given by the defendants did not wipe out this provision of the contract. The lower Court properly said: "The effect of the two extension agreements was simply to substitute for August 31, 1959, in the original agreement, first, November 30, 1959, and second, April 30, 1960. Such substitutions did not affect any other term or condition of the agreement. Defendants complain that there was no consideration for these extensions. We hold that independent considerations were not necessary to ef-

fectuate the extensions; this was merely a case of both sides to the agreement giving mutual consent to a modification of an agreement in force between them. Therefore, plaintiff was within its rights under the contract when it notified defendants that it was exercising its option to extend the closing date 120 days from April 30, 1960, and was not in default at the time tender was made."

Thus, when the plaintiff tendered payment on May 24, 1960, it could not be considered in default and the defendants had no legitimate excuse to avoid fulfillment of their obligations. The only explanation given by the defendants for refusing to tender the deed when the plaintiff tendered the purchase price is that they wanted more money than the amount stipulated in the contract. It often happens in the business life of the world that a person enters into a contract, estimating for himself certain advantages and profits, only to reason later that he should have asked for more than he promised to accept. He then seeks to find a flaw in the agreement which will permit him either to break the contract or to demand an augmentation in the returns coming to him from the other side.

If this change of horses in the middle of the stream of contractual obligations were to be permitted, simply because one of the parties was dissatisfied with what he had agreed to do, very few contracts would reach the other side of the stream dry and staunch enough to carry on with the rest of the legal journey. There would be no stability to covenants, no reliability to promises, no assurance of regularity in business dealings, if this were to be permitted. As nature abhors a vacuum the law abhors unreliability in compacts and understandings solemnized in writing or by any other method which expresses a meeting of minds.

The defendants finally argue that "The plaintiff's conduct in the transaction was not in accordance with

good conscience, good faith and fair dealing." In support of this charge, they cite from *Reynolds v. Boland*, 202 Pa. 642: "Specific performance . . . is of grace and not of right: [citing cases]. From the lips of this complainant, who sues for grace, along with his prayer for a decree that the defendant specifically perform his agreement, there comes a confession that its purpose was to deceive, and the ear of the chancellor will not hear the prayer. Into hands soiled by a contract, equity will not place her decree for its enforcement. 'The doors are shut against one, who, in his prior conduct in the very subject-matter at issue, has violated good conscience, good faith or fair dealing:' . . ."

This is an excellent quotation but its adjuration has no application to this case. There is no evidence that the plaintiff intended to deceive the defendants; there is not the slightest suggestion that the hands of the plaintiff were soiled in ill dealing. Mr. Traylor testified that at the time of the original contract a Mr. Negley representing the plaintiff "told us we didn't need no attorney, and keep my son-in-law out of it, George Kelly." George Kelly was a "notary public and he sells real estate."

Defendants' counsel argues in his brief that as the result of what Mr. Negley said, the defendants entered into a contract "that was both unreasonable and unfair," but he does not specify wherein the contract was "unreasonable and unfair." He argues: "One has but to look at the agreement they signed to realize that defendants did need a lawyer and the advice of a reliable real estate agent."

Looking at the agreement shows it to be a clear, unambiguous statement of terms. It is short, concise and unclouded with complicated legalistic language. Since the contract was signed on April 6, 1959, the defendants had ample time prior to their written

agreement to extend the time for settlement in which to study the terms and to ask for reformation if they found that both parties had made a mistake or to rescind if they found they had been overreached and legally imposed upon. When the period in which the 120-day extension of the contract could be exercised by the plaintiff had terminated and the plaintiff had not yet obtained the authorizations it was seeking, the defendants could then have terminated the contract (November 30, 1959). Not only did they not so terminate the contract but on April 11, 1960, as already stated, they voluntarily appeared at the hearing before the City Council of Pittsburgh to urge that the Council grant to the plaintiff the change in zoning classification, something it absolutely needed in order to consummate the sale.

In view of this consistent, unbroken demonstration of faith on the part of the defendants in the plaintiff's integrity, it is difficult to understand on what basis they claim they were deceived. As desirable perhaps as it may have been for defendants to have had the advice and counsel of an attorney and real estate agent, there is no evidence that they were in any way injured in not having legal assistance in the simple negotiations involved. And it certainly cannot be pretended that Mr. Negley's alleged statement prevented them from speaking to an attorney or real estate agent if they wished to do so. Both defendants are literate, there is nothing in the record even to suggest any physical or mental infirmity which incapacitated them from fully comprehending what they were doing. At the time the contract was signed, Mr. Traylor was 66 years of age and apparently in good health. Even two years later, at the time of the hearing in court, he was employed by the Grant Building. He has not submitted the slightest bit of evidence to show that he lost anything because he did not have an attorney or

real estate agent to counsel him. A runner who has good legs cannot complain that he lost the race because he was not given a pair of crutches.

The record and all applicable law leads inevitably to the conclusion that the chancellor made no error in decreeing specific performance of the contract and the decree in the court below is therefore

Affirmed; each party to bear own costs.

Mr. Justice O'BRIEN took no part in the consideration or decision of this case.