## Gullone v. Credus

*James C. Scanlon,* for plaintiffs.
*Peter J. O'Brien,* for defendant.

WILLIAMS, P. J., September 27, 1971.—On October 2, 1968, plaintiffs, Samuel F. Gullone and his wife, Margaret Gullone, filed a complaint in equity against defendant, Mary K. Credus, seeking the specific performance of an agreement of sale, executed on July 11, 1968, by the husband-plaintiff in behalf of himself and the wife-plaintiff, and by defendant, whereby defendant undertook to sell her house and lots, located at Blakeslee, Tobyhanna Township, Monroe County, Pa., to the husband-plaintiff for $15,000 cash, with settlement on or before September 19, 1968. An answer with new matter and a reply to the new matter were filed. On the basis of the pleadings, together with the testimony and evidence presented by the parties before the court at a hearing held on July 28, 1970, the following findings of fact may be made:

## FINDINGS OF FACT

1. Plaintiffs are Samuel F. Gullone, also known as Sammy F. Gullone, and his wife, Margaret Gullone, who reside at 750 Hermit Lane, Philadelphia, Pa. Mr. Gullone is a roofing contractor.

2. Defendant, Mary K. Credus, resides at Blakeslee, Tobyhanna Township, Monroe County, Pa.

3. Defendant was born in Poland on March 10, 1890, and was 78 years of age at the time when this action was commenced.

4. Defendant came to this country in 1906 or 1907 when she was 16 or 17 years old.

5. Defendant has had no formal education, either in Poland or in this country. She can speak and understand the English language, as demonstrated by her testimony in court, but her ability to read and write is limited.

6. Defendant is the widow of John F. Credus, who died on October 17, 1955.

7. On the death of John F. Credus, defendant became owner as surviving tenant by entireties of the lot or piece of land, situate in Tobyhanna Township, Monroe County, Pa., described as follows:

"No. 1. BEGINNING at a point in the middle of the Wilkes-Barre and Easton Turnpike, from which an iron pin in the middle of the lane leading to the barn bears South sixty-two and one-quarter degrees West distant twenty feet: THENCE along land of Elizabeth Riechers, of which this lot was formerly a part, South sixty-two and one-quarter degrees West one hundred forty-two and one-half feet to an iron pin; thence by the same South twenty-five and three-quarters degrees East sixty-three feet to an iron pin from which the southwest corner of the house is forty-five feet distant and the northeast corner of the garage, fourteen and eight-tenths feet distant; thence by the same South sixty-three degrees West ninety-six and three-quarters feet to a post; thence by the same, North sixty-two and one-half degrees East two hundred forty-five feet to a point in the middle of the above mentioned turnpike; thence along the middle of said turnpike along lands of Frank Blakeslee, North thirty degrees West one hundred ninety-four feet to the place of BEGINNING.

"EXCEPTING AND RESERVING all that lot or piece of land that Elizabeth S. Riechers by deed dated July 24, 1933, and recorded in Deed Book Vol. 118, Page 430, granted and conveyed unto John Minetola et ux.

"BEING the same premises that Elizabeth S. Riechers, widow, by deed dated December 7, 1949, and recorded in the Office for Recording of Deeds, in and for the County of Monroe at Stroudsburg, Pennsylvania, in Deed Book Vol. 174, Page 62, granted and conveyed unto John F. Credus and Mary K. Credus,

his wife; and the said John F. Credus died on the 17th day of October, 1955, whereupon said premises vested in Mary K. Credus as surviving tenant by the entireties."

8. By deed dated June 6, 1961, but not recorded until August 20, 1968, defendant acquired a second lot, adjacent to the first and situate likewise in Toby-hanna Township, described as follows:

"No. 2. BEGINNING at an iron pipe on the souther-ly side of a proposed street, designated as Reichers Avenue, being the northwesterly corner of other lands of Grantee hereof: THENCE along other lands of the grantee hereof, South twenty-four degrees fifty-five minutes twenty seconds East sixty-three and six one-hundredths feet to a point; thence by the same, South sixty-one degrees forty-two minutes fifty seconds West ninety-six and seventy-eight one-hun-dredths feet to a stake; thence by other lands of the Grantor hereof, of which this lot was formerly a part, North twenty-nine degrees thirty minutes twenty seconds West sixty-four and nineteen one-hundredths feet to an iron pipe on the southerly side of said Reicher Avenue, North sixty-two degrees twenty-six minutes East ninety-seven and sixty-three one-hun-dredths feet to the place of BEGINNING. CONTAIN-ING 0.14 Acres more or less.

"BEING the same premises that Megargel's Golf, Inc., by deed dated June 6, 1961, and recorded August 20, 1968, in the aforesaid Office in Deed Book Vol. 363, Page 853, granted and conveyed unto Mary K. Credus, in fee."

9. Somewhat less than a year prior to July 1968, without engaging anyone to sell the property for her, defendant caused a sign to be posted in front of her residence which read: "For Sale."

10. Plaintiff, Samuel F. Gullone, had driven past

defendant's property and observed the sign on several occasions. Late in June, two or three weeks prior to July 11, 1968, when he was alone, plaintiff stopped there to address to defendant his inquiries concerning the possible sale of the property.

11. Defendant told plaintiff that she wanted to sell the property, that she had been asking $20,000, but that she would accept $15,000 "cash."

12. Plaintiff told defendant that he would return in a couple of weeks with a real estate man to make an agreement of sale.

13. On July 11, 1968, plaintiff, Samuel F. Gullone, returned to defendant's residence, accompanied by Joseph L. Messa, a Philadelphia real estate broker who brought with him a portable typewriter and a supply of printed forms of agreement of sale.

14. After introductions, defendant took Mr. Gullone and Mr. Messa all through her property.

15. Mr. Messa inquired of defendant, "Who represents you?", to which she replied, "I represent myself, I don't need anybody."

16. For the negotiations which followed, plaintiff, Mr. Messa, defendant, and a roomer of defendant's named Darryl Megargel, sat around a table in the kitchen.

17. At Mr. Messa's request, defendant produced her two title deeds to the premises described in findings nos. 7 and 8, supra.

18. When Mr. Messa called defendant's attention to the fact that the deed from Megargel's Golf, Inc., had not been recorded, defendant expressed her desire that he should have this done.

19. Plaintiff offered $12,000 for defendant's property, but acceded to her demand of $15,000 clear, with no commissions to be paid.

20. Mr. Messa then typed appropriate provisions in the spaces of the printed form of agreement of sale.

21. Therein, Mary K. Credus, widow of John F. Credus, agreed to sell to Sammy F. Gullone and Margaret Gullone, his wife, who agreed to purchase premises "2½ sty. frame one family situated on South side of Rt. 115 leading from Blakeslee to Effort, Tobyhanna Twp., Monroe County, Penna. . . . This sale includes House & garage and grounds thereon plus additional ground from Megargel's Golf, Inc." for the total sum of $15,000, to be paid as follows: cash at signing of the agreement, $200, and cash at settlement, September 19, 1968, at the title office of the Commonwealth Land Title Insurance Co., $14,800; settlement to be made on or before September 19, 1968.

22. In the space provided for the name of a broker, Mr. Messa typed the word "NONE."

23. With respect to default by the purchaser, the printed form provided:

"Should the Purchaser fail to make settlement as herein provided or default in performing any other covenants or conditions of this agreement, the sum or sums paid on account of the purchase price may be retained by the Seller (a) as liquidated damages, or (b) on account of the purchase price, *as the Seller may elect,* and, if retained as liquidated damages, this contract shall become null and void and cancellation shall automatically take place. Nothing herein mentioned or contained, however, shall limit or debar the Seller from resorting to any appropriate remedy in law or in equity." (Italics supplied.)

24. With respect to default by the seller, the printed form provided:

"PREMISES to be conveyed clear of all liens and incumbrances, except as aforesaid . . .

"TITLE is to be good and marketable and such as will be insured at regular rates by any responsible Title Insurance Company; otherwise the Purchaser shall be repaid all his money paid on account and shall also be reimbursed for the cash outlay which Purchaser may have been put to for Title Insurance and drawing papers."

25. In a space near the bottom of the printed form, and spilling out into the right-hand margin, Mr. Messa typed the following additional provision:

"This sale includes Deeds of Elizabeth S. Reichers, Widow to John F. Credus Et UX. Recorded Monroe Co. D.B. No. 174 pg. 62, Dec. 7th, 1949 and a Deed from Megargel's Golf, Inc. to Mary K. Credus dated June 6, 1961. The attorney Harold C. Edwards of 700 Monroe St. Stroudsburg, Penna. This sale is contingent upon the buyers right to go on with the sale or the sale is null and void if house, gargage (sic), ground and extra lot from Megargel's is not conveyed and depos . . . and deposit returned . . ."

26. Mr. Messa read the agreement to defendant twice: once before the additional provision was inserted, and again after Mr. Messa had added the provision set forth in finding no. 25 supra.

27. Plaintiff and defendant signed the agreement of sale, dated July 11, 1968, and Joseph L. Messa signed as witness.

28. Plaintiff gave defendant a check in the amount of $200 as a deposit on the sale, and defendant endorsed a receipt for the same upon the agreement of sale.

29. Mr. Messa gave defendant a copy of the agreement of sale which she had just signed.

30. At some point of time in the course of the transaction, not precisely established by the testimony, plaintiff informed defendant that he intended

to have a title search made concerning the property, and told her that she could have a lawyer, but that she didn't have to have a lawyer.

31. Defendant endorsed the $200 check, and on Monday, July 15, 1968, either cashed it or deposited it at the First Stroudsburg National Bank.

32. On the morning following the date of execution, Mr. Messa, through his wife, referred the agreement of sale to the Commonwealth Land Title Insurance Company for the purpose of obtaining a title search.

33. About this time, defendant was planning to buy and move to a property in Pittston, Pa. Two weeks after the agreement of sale for the Blakeslee property had been signed, plaintiff, at defendant's request, drove her to Pittston and brought her back again.

34. On August 20, 1968, the deed dated June 6, 1961, from Megargel's Golf, Inc. to defendant finally was recorded in deed book, vol. 363, page 853.

35. At some time prior to the date of settlement, defendant declined a suggestion, advanced by plaintiff and Mr. Messa, that she might accept a $7,000 purchase money mortgage in lieu of cash for a portion of the balance of the purchase price.

36. A few days prior to September 11, 1968, defendant summoned Ed Mack, a Blakeslee real estate broker, to her home for consultation concerning the sale.

37. Mr. Mack disavowed ability to advise defendant on legal matters, told her that she needed an attorney, and recommended that she should see Peter J. O'Brien, Esq.

38. Defendant consulted Mr. O'Brien on September 11, 1968, and he immediately wrote and sent to plaintiff a letter which read:

"Dear Mr. Gullone:

"Mrs. Credus has consulted me concerning the agreement of sale executed by her on July 11, 1968. As you may know, she is 78 years of age, a widow, and not at all familiar with the detailed contents of the agreement. She advises me that she delivered her two deeds concerning this property to you.

"Please be advised that I have advised her that she is not obligated to fulfill this agreement in view of the unconscionable circumstances surrounding the execution. I want to advise you that you must return her two deeds to me immediately. If you desire to renegotiate a new agreement of sale, kindly contact me or have your attorney contact me."

39. In addition to writing the above letter, Mr. O'Brien requested Mr. Ed Mack to appraise defendant's property.

40. On September 12, 1968, apparently before learning of Mr. O'Brien's letter, Mr. Messa sent defendant the title certificate issued by the Commonwealth Land Title Insurance Company, together with a letter which read:

"Dear Mrs. Credas:

"My client, Mr. Gullone is ready, willing and able to settle your property at this time. However, there is a $15,000.00 mortgage of Megargel's Golf, Inc. to First Federal S/L Assn. of Wilkes-Barre. This must be cleared up before we can settle. Also we would need all your tax receipts for the years 1965-1967. And on the enclosed title certificate you see that there are the following objections pertaining to you:

"Certificate of Incorporation of Megargel's Golf, Inc. to be produced and filed with Commonwealth Land Title Insurance Company.

"Taxes settled by the Commonwealth of Pennsylvania against Megargel's Golf, Inc.

"Unsettled taxes due the Commonwealth of Pennsylvania by Megargel's Golf Inc. (If the transfer to Mary K Credas exceeds 50% of the Real Estate holdings of said Corporation, a 'Clearance Certificate' must be produced from the Department of Revenue showing all corporate taxes paid of settlement.)

"Please take care of this immediately so that we may proceed with the settlement."

41. On September 16, 1968, plaintiffs, through their agents, Joseph L. Messa and Virginia Messa, contacted Peter J. O'Brien, Esq., by telephone and advised him that settlement would be held on September 18, 1968, at the office of Scanlon & Lewis, agents for the Commonwealth Land Title Insurance Company, 190 Washington Street, East Stroudsburg, Pa. Mr. O'Brien advised plaintiffs' agents that defendant would not be present at the closing, and that she did not intend to comply with the provisions of the agreement of sale.

42. On September 16, 1968, plaintiffs, by their agent, Joseph L. Messa, sent telegrams to defendant and her attorney, Peter J. O'Brien, Esq., advising them that settlement would be held at the office of Scanlon & Lewis, 190 Washington Street, East Stroudsburg, Pa., on September 18, 1968, at 2 p.m.

43. On September 18, 1968, the husband-plaintiff appeared at the said office of Scanlon & Lewis and delivered to them a certified check in the amount of $16,000 for the purpose of paying the $14,800 balance of the purchase price and various additional costs of settlement.

44. At the last mentioned time and place, James C. Scanlon, Esq., called Peter J. O'Brien, Esq., on the telephone and advised him that the husband-plaintiff

was present with the aforementioned certified check, and Mr. O'Brien reiterated that defendant would not be present and did not intend to comply with the agreement of sale.

45. On September 19, 1968, Mr. Ed Mack submitted to Mr. O'Brien his appraisal of defendant's property in the amount of $21,800.

46. Mr. Mack, apparently unaware that the Megargel deed had been recorded almost a month prior to the time when he undertook his appraisal, testified that his appraisal did not include that parcel because the deed had not yet been recorded.

47. On a number of occasions after September 16, 1968, the husband-plaintiff made telephone calls and personal visits to defendant, attempting to persuade her to perform the agreement of sale.

48. Plaintiff told defendant that even if she succeeded in obtaining a higher price through renegotiation or litigation, she would gain little because of the necessity for paying the attorney's fees thus incurred.

49. Plaintiff told defendant that in making herself out to be an incompetent for the purpose of avoiding her contract, she was exposing herself to possible institutionalization in a nursing home, a home for the aged or a mental hospital, with a guardianship to protect her property from designing persons.

50. On October 2, 1968, plaintiffs commenced the instant action in equity for specific performance against defendant.

51. On November 4, 1968, defendant, through her attorney, returned the deposit of $200 to plaintiffs' attorney, subject to an agreement of counsel that neither plaintiffs nor defendant should be prejudiced by this action.

## DISCUSSION

The defense to this action is two-fold: First, it is

contended that the entire agreement is void for want of mutuality of contract, and, second, that even if the contract is valid, the equitable remedy of specific performance is not available to plaintiffs because they obtained the agreement of sale by means of duress, coercion and undue influence.

## LACK OF MUTUALITY OF CONTRACT

It is argued that a fatal defect was imported into the otherwise standard form of agreement when plaintiffs' agent, Mr. Messa, typed in the additional provision set forth in finding of fact no. 25. A portion of this language is:

"This sale is contingent on the buyer's right to go on with the sale or the sale is null and void if house, garage, ground and extra lot from Megargel's is not conveyed and depos . . . and deposit returned . . ."

It is argued that this provision renders all of the promises and obligations of plaintiff illusory, that it provides a loophole with which plaintiff may escape from the contract with no penalty whatsoever.

In speaking of the mutuality of contract, the court, in Jessup & Moore Paper Co. v. Bryant Paper Co., 283 Pa. 434, 440, said:

"In order that a contract be mutual, it is not necessary that each (party) should have precisely the same remedy, either in form, effect or extent. It is sufficient if both have the power of compelling performance of the promises respectively made (citing cases)."

In Jessup also appears this language:

"In addition to what is said above, we may add, in the language of Meurer Steel Barrel Co. v. Martin, 1 Fed. R. (2d series) 687-8. 'The terms "consideration" and "mutuality of obligation" are sometimes confused. Consideration is essential; mutuality of obligation is

not, unless the want of mutuality would leave one party without a valid or available consideration for his promise. The doctrine of mutuality of obligation appears therefore to be merely one aspect of the rule that mutual promises constitute consideration for each other. Where there is no other consideration for a contract, mutual promises must be binding on both parties. But where there is any other consideration for a contract, mutuality of obligation is not essential.' "

Even though the language under attack could be construed to provide a loophole for escape without penalty to plaintiffs, such asserted escape option is supported by consideration in the form of $200 cash deposit which plaintiffs paid to defendant on account of the agreement of sale. This being true, mutuality of obligation would not be essential to the validity of the contract.

It is true that a printed contract is to be construed most strongly against the one who provided it: McElhinney v. Belsky, 165 Pa. Superior Ct. 546, 550. An additional principle of construction is found in Tudesco et ux. v. Wilson, 163 Pa. Superior Ct. 352, 356, where Judge Fine said:

"In construing a written contract, the effect thereof is to be ascertained not solely from the terms of the instrument, but from the real nature and character of the transaction, giving consideration to all the provisions under which the parties contracted, their situation, relations and any acts indicative of the meaning they ascribe thereto . . . ."

The circumstances under which the agreement of sale was drawn, as developed at the hearing, show that plaintiffs expected to purchase a single dwelling and lot. When defendant produced her title deeds, plaintiffs and their agent learned for the first time that her property comprised two parcels, the title

to the larger being derived from a recorded deed, and the title to the smaller one being derived from an unrecorded deed. This fact alerted plaintiffs and their agent to the possibility that conveyances or mortgages executed by Megargel's Golf, Inc., or liens against that corporation, might impair or destroy defendant's ability to convey marketable title to that parcel. It is reasonable to infer that the language of the additional provision (finding no. 25, supra) was incorporated into the draft of the agreement of sale for the purpose of dealing with this situation.

The first sentence of that provision clearly evidences plaintiffs' desire to acquire *both* parcels. The second sentence (here produced verbatim, in original word order, with the addition of bracketed numbers for the purpose of clarification) reads as follows:

(1) "This sale is contingent upon"

(2) "the buyers right to go on with the sale or"

(3) "the sale is null and void if"

(4) "house, garage, ground and extra lot from Megargel's is not conveyed and depos . . . deposit returned . . ."

This additional provision confers upon plaintiffs, not the unfettered privilege of escaping at will from their contractual obligations, but rather the qualified privilege available to them only in the event that defendant herself defaults in her obligation to convey marketable title to the Megargel strip.

In effect, the provision is a somewhat inartistic paraphrase of the principle stated by the Supreme Court in Medoff v. Vandersall, 271 Pa. 169, 171, 172, where Mr. Justice Kephart said:

"The general rule is well settled, a vendee may elect to take a partial performance of a contract by the vendor; especially is this true where the vendee is willing to take a defective title without seeking

abatement in the purchase price. In such cases, the vendor will not be permitted to set up his defective title as a defense in an action for the specific performance of his contract. . . ."

We find that the agreement of sale is a valid binding contract.

## SHOULD SPECIFIC PERFORMANCE BE DENIED BECAUSE OF DURESS, FRAUD AND UNDUE INFLUENCE?

There are a number of instances where the courts have refused to grant specific performance of a contract where execution of the contract was attended by unconscionable circumstances. Such a conclusion was reached in Brady's Appeal, 66 Pa. 277 (1870); Wilson v. Hane, 16 Chester 8 (1967); Potter's Estate, 6 Pa. Superior Ct. 627, 630, 631, 632 (1898).

The instant case is distinguished from the foregoing authorities upon a ground which goes to the very root of the concept of undue influence. There, the transactions were conceived and initiated by the proponent parties who drew the papers, sought out the opposite party and obtained his or her signature to them.

Here, at least three important aspects of the transaction were originated, not by plaintiffs but by defendant herself.

(1) The decision to sell the Credus property was made by defendant when she posted a "For Sale" sign on it somewhat less than a year before plaintiff Samuel Gullone stopped there to make inquiries.

(2) The desire to accomplish the sale, so far as possible, without the assistance of real estate agents or attorneys, was not imposed upon defendant by plaintiffs, but was her own. She herself had the "For Sale" sign posted. Later, when Mr. Gullone and Mr.

Messa went to negotiate the sale, the latter asked, "Who represents you?" And the defendant replied, "I represent myself, I don't need anybody." This wish was respected by plaintiffs when their agent, Mr. Messa, typed the word, "NONE," in the space of the printed form provided for the name of the agent. Their conduct contrasts sharply with that of the buyer in Wilson v. Hane, supra, who inserted the reservation of a six percent "finder's fee" for himself.

(3) The purchase price was first suggested by defendant when, on Mr. Gullone's first visit, she told him that she had been asking $20,000 but would take $15,000 cash.

It is true that Mr. Gullone told defendant that she did not have to have a lawyer. An even stronger expression failed to persuade the Supreme Court to deny specific performance in Sun Oil Co. v. Traylor, 407 Pa. 237, 244, 245, 180 A. 2d 235, 239 (1962), where plaintiff's representative had told defendants that they ". . . didn't need no attorney, and keep my (defendant's) son-in-law (George Kelly, a notary public dealing in real estate) out of it." Mr. Justice Musmanno said:

". . . As desirable perhaps as it may have been for defendants to have had the advice and counsel of an attorney and real estate agent, there is no evidence that they were in any way injured in not having legal assistance in the simple negotiations involved. And it certainly cannot be pretended that Mr. Negley's alleged statement prevented them from speaking to an attorney or real estate agent if they wished to do so."

In the instant case, the two or three weeks which intervened between Mr. Gullone's first visit, and July 11, 1968, when he brought Mr. Messa with him to draw the agreement of sale, as he told defendant he

would, afforded her ample opportunity to secure whatever counsel she might choose.

Constitutional principles assure the involuntary condemnee in eminent domain proceedings of compensation equivalent to the fair market value of the property at the time of taking. Such assurance is not, however, applicable to voluntary transfers of title, where the vendor may refuse to sell unless he can obtain a price satisfactory to him under the circumstances in which he finds himself.

In Oreovecz v. Merics, 382 Pa. 56, 59, 60, 114 A. 2d 126, 128 (1955), cited by counsel for plaintiffs, the Supreme Court affirmed a decree granting specific performance of an agreement to sell a property for $4,000, and Mr. Justice Musmanno said:

"With regard to inadequacy of consideration, the defendant asserted that he had had an offer for the property of $5,000.00 from a Paul Berger, but the Chancellor found that Merics had told Oreovecz that he would rather sell the property to him (Oreovecz) because Oreovecz would pay quickly whereas Berger's money 'was to come through a GI loan on his son-in-law'. While $4,000.00 was probably a rather attractive purchase price, the record does not show any evidence of fraud or unfair conduct between the parties which would make the matter of consideration one for equity's intervention. In Welsh et ux. v. Ford et ux., 282 Pa. 96, 99, this Court said: 'Inadequacy of consideration is not ground for refusing to decree specific performance of a contract to convey real estate, unless there is evidence of fraud or unfairness in the transaction sufficient to make it inequitable to compel performance . . . "Inadequacy of price, improvidence, surprise, and mere hardship, none of these, nor all combined, furnish an adequate reason for a judicial recission of a contract. For such action, something

more is demanded,—such as fraud, mistake or illegality." ' " See also Payne v. Clark, 409 Pa. 557, 561, 562, 187 A. 2d 769, 771 (1963).

In the instant case, long before defendant had any contact with Mr. Gullone, Mr. O'Brien or Mr. Mack, it is apparent that she conceived that her property potentially was worth $20,000, only $1,800 short of the more optimistic appraisal submitted by Mr. Mack, since that originally was her asking price. Her acceptance of plaintiffs' promise of $15,000 was subject to the condition, important to her, that it be paid in *cash*. Conceivably, the lesser amount in cash was more advantageous to her than a greater figure at some future date, or secured by mortgage, since, according to her own testimony, she was planning to buy another property in Pittston.

Finally, it is urged that plaintiffs exerted undue influence upon defendant by telling her that, unless she performed her obligations under the agreement of sale, she would expose herself to possible institutionalization in a nursing home, a home for the aged or a mental hospital, with a guardianship to protect her property from designing persons. Such statements, made two months *after* the execution of an otherwise unimpeachable agreement of sale, in response to defendant's anticipatory breach of her contractual obligations, cannot impair the validity of that agreement. They could have become relevant for that purpose only if they had been part and parcel of a prior calculated plan by plaintiffs to fraudulently or unfairly deprive defendant of her property.

## CONCLUSIONS OF LAW

1. The agreement of sale executed on July 11, 1968, by plaintiff, Sammy F. Gullone, on behalf of himself and his wife, plaintiff Margaret Gullone, and by defendant, Mary K. Credus, is a valid contract.

2. There is no evidence that the said agreement of sale was procured by duress; coercion or undue influence.

3. Plaintiffs are ready, willing and able to perform their obligations under the agreement of sale.

4. Defendant has refused to perform her obligations thereunder.

5. Plaintiffs are entitled, without other qualification, to specific performance of the said agreement of sale upon filing an election not to claim abatement of the purchase price for defects in defendant's title to the lot derived from Megargel's Golf, Inc.

## DECREE NISI

And now, September 27, 1971, it is decreed and adjudicated as follows:

1. The complaint for specific performance of plaintiffs, Samuel F. Gullone and his wife Margaret Gullone, against defendant, Mary K. Credus, is granted on condition that plaintiffs file with the court their election not to claim abatement of the purchase price for defects in defendant's title to the lot derived from Megargel's Golf, Inc.

2. Within 20 days after this decree has become final, plaintiffs are directed to (a) file the said election; (b) prepare and present to defendant for execution a deed conveying to plaintiffs her property, comprising both the lot derived from the deed dated December 7, 1949, and recorded in deed book, vol. 174, page 62, of Elizabeth S. Riechers, widow, to John F. Credus and Mary K. Credus, and the lot derived from the deed dated June 6, 1961, and recorded in deed book, vol. 363, page 853, of Megargel's Golf, Inc., to Mary K. Credus; and (c) pay to defendant the cash purchase price of $15,000. On receipt of the said purchase price, defendant is directed to sign and acknowledge the deed of conveyance.

3. This decree shall become final on the twentieth day after the date thereof, unless plaintiffs or defendant shall file exceptions thereto.